[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 593.]

THE STATE OF OHIO, APPELLEE, *v*. CARTER, APPELLANT.

[Cite as *State v. Carter*, 2000-Ohio-172.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-921—Submitted February 22, 2000—Decided September 13, 2000.)

APPEAL from the Court of Common Pleas of Trumbull County, No. 97-CR-558.

_____

{¶ 1} Appellant, Sean Carter ("Carter"), was charged with aggravated murder committed during an aggravated robbery, aggravated burglary, and rape. He was also charged with three felony-murder specifications, as well as separate counts of aggravated robbery, aggravated burglary, and rape. He was convicted of aggravated murder and two of the specifications, aggravated robbery, rape, and the lesser-included offense of criminal trespass. The jury recommended that Carter be sentenced to death, and the trial court adopted the jury's recommendation.

{¶ 2} Evely Prince Carter adopted Sean Carter when he was ten years old. Carter had been taken from his birth mother in 1981, due to neglect and abuse. Evely Carter lived in close proximity to her mother, Veader Prince ("Prince"), the victim in this case. In February 1997, Carter had been thrown out of Evely Carter's house and began living with Prince, his adoptive grandmother. He stayed there until July 1997, when he was incarcerated at the Geauga County Jail for theft.

{¶ 3} On Saturday, September 13, 1997, Vernon Prince, Prince's son, stopped by to see his mother and noticed Carter sleeping in her house. Prince was not there. As Vernon Prince was leaving, Prince pulled in the driveway and upon being questioned, told Vernon Prince that she did not know that Carter was there. Prince and Vernon Prince went inside the house and Prince talked to Carter. When she came out of the room where Carter had been sleeping, Prince asked Vernon Prince to give Carter the keys and title to his car (blue 1984 Chevette) so that Carter

could leave. Vernon Prince complied with this request. Vernon Prince also gave his mother some money ($250) before he left. At that time, Carter was still in Prince's house.

{¶ 4} That same day, Evely Carter worked from 2:00 p.m. until 10:00 p.m. During her shift, she received a telephone call from her husband, informing her that Carter had been released from jail. She stopped at Prince's house after she got off work, arriving at 10:45 p.m. She tried to enter the door and found that it was locked, something her mother had never done. She knocked on her mother's window and then her mother opened the door.

{¶ 5} Prince explained to Evely Carter that the door was locked because she "told that boy [Carter] that he wasn't allowed to come back here." When Evely Carter saw her mother that night, Prince was wearing a white turban with a long john top underneath a white T-shirt and long john bottoms.

{¶ 6} Evely Carter went to work the next day, Sunday, September 14, and did not get off work until 11:00 p.m. Her husband called her at work and told her that she should check on her mother because no one could find her. Evely Carter went to Prince's house. She entered and called out for her mother. There was no answer. She left Prince's house to get her husband and returned with him to Prince's house. At that time it was midnight.

{¶ 7} Also on Sunday, another of Prince's sons, Travis Prince, had gone to Prince's house around 10:00 a.m. He had walked into her bedroom and heard water running in the bathroom. Though the door to the bathroom was closed, he could tell the light was on. He went into the kitchen of the house and saw chicken in a pot on the stove, simmering. Travis Prince left the house.

{¶ 8} When he returned later in the day, he saw the same scene. This time, he opened the bathroom door, and upon discovering that it was empty, he turned the water off. He yelled for his mother and, getting no answer, became alarmed.

2

He returned to the kitchen to turn off the stove and then began going through each room calling for his mother.

{¶ 9} After searching the house and yard, he returned to the kitchen and noticed a note on the table that said, "Took Sean to the hospital." At that point he had not noticed any blood in the house. He did not think it was Carter, because he believed that Carter was still in the county jail. Since he could not find her, her purse, or her keys, he decided that his mother must have given a ride to someone, and ceased being concerned. Travis Prince left the house around 7:00 p.m., and returned to his apartment.

{¶ 10} When he arrived home, he called his brother-in-law, Jerry Carter (Evely Carter's husband), and asked if he had seen Prince, but he had not. Jerry Carter went to Prince's house and could not find Prince. He told Travis Prince that Evely Carter would check again at 11:00 p.m., after she got off work. Travis Prince met the Carters at his mother's house around 11:15 p.m., and talked to neighbors to see if they knew anything about Prince's absence. Jerry and Evely Carter and their nephew, James Shoper, began to search the area.

{¶ 11} They searched the garage and the cars in the driveway. Evely Carter noticed a garbage bag with clothes in one of the vans. They went back into the house, and then down into the basement. Evely Carter noticed a chair that had blood on it. As they continued searching the basement, they saw Prince's feet sticking out of a pile of clothes on the basement floor. They called the police immediately.

{¶ 12} Once the clothes were removed, Prince was found lying face down on the basement floor. She was wearing only a white T-shirt, which was covered with blood and had holes. Her glasses were pushed up on her head and one of the lenses was missing, found later on the floor of the basement. Her dentures were discovered in the master bedroom. Prince's body appeared to have lacerations on her hands and face. Police found significant bloodstains on the carpet in the master

bedroom, on a couch, and on the mattress. They also found droplets and stains of blood on the stairs and the walls leading to the basement.

{¶ 13} An autopsy revealed that Prince had suffered eighteen stab wounds, a subarachnoid hemorrhage caused by blunt trauma, abrasions, and contusions to her right thigh. The left side of her face was swollen, indicating blunt trauma. One stab wound nicked the aorta, which was the immediate cause of death. Other forensic testing revealed the presence of sperm, located on a swab taken from the rectum of the victim. The swabs taken of the mouth and vagina were negative. DNA testing matched the rectal swab to Carter.

{¶ 14} After talking to the family during the investigation, the police placed a "pick-up and hold" order on Carter. They learned that another of Prince's sons had been in jail with Carter, and that Carter had made a remark to him about not getting along with his grandmother.

{¶ 15} On September 15, 1997, Daniel Hepler, a police officer with the Chippewa Township Police in Beaver County, Pennsylvania, was on patrol when he noticed a vehicle backed in among some small trees. The car had Ohio plates and he called the dispatcher to run the plate number. Hepler approached the vehicle and noticed a person (Carter) sleeping in the back seat. He knocked on the window and asked Carter to get out of the car. Carter had no identification or registration information for the vehicle. Carter told Hepler his name was "Bill Carl" and gave him a date of birth; a computer search revealed that no such person existed. The license plate information came back as registered to a Chrysler vehicle, even though the vehicle was a Chevrolet. Because the name and date of birth provided by Carter were false and the car's registration was fraudulent, Hepler told Carter that he was going to issue a citation and tow the car.

{¶ 16} While waiting for the tow truck to arrive, Hepler did a plain view inspection of the car for personal effects. Carter stated he did not want anything from the car. Hepler found two sets of keys and some money, which he gave to

Carter. When the tow truck arrived, Hepler transported Carter to the police department. Carter appeared confused and kept asking Hepler where he was.

{¶ 17} When the vehicle registration came back as not matching the vehicle, Hepler obtained the vehicle identification number (VIN) and ran it through the computer. The car was registered to Vernon Prince. Hepler obtained a phone number and telephoned the Prince residence. The woman who answered the phone informed Hepler that the man he had in custody was wanted for murder.

{¶ 18} Hepler contacted the Trumbull County Sheriff's Department and verified that Carter was wanted for questioning relating to a murder. Carter was placed in a holding cell while detectives from the sheriff's department traveled to Pennsylvania.

{¶ 19} Major James Phillips, Sergeant Hyde, and Lieutenant Borger traveled to Chippewa Township to question Carter. After giving Carter his *Miranda* warnings and obtaining a waiver of his rights, Phillips and Hyde obtained an audio and video confession to the murder of Veader Prince.

{¶ 20} According to Carter's confession, after he obtained the car keys from Vernon Prince, he left Prince's house and drove around for a while. He attempted to stay at his aunt's house, but could not. He returned to Prince's house and, since the door was locked, climbed through the bedroom window. He had called out to Prince, hoping to convince her to allow him to stay there for a week. They got into an argument and Prince told him to leave. He kept telling her that he had nowhere to go.

{¶ 21} She tried to push him out the door and he started to beat her. At some point, he got a knife from the kitchen and started stabbing her. He described it as just "going off" and could not provide exact details of what happened during the assault, although he did remember hitting her in the face and stabbing her in the neck.

{¶ 22} The next thing Carter remembered was being in the kitchen and washing his hands and the knife. He walked downstairs and saw Prince on the basement floor and then started to cover things up. He covered her with some clothes, moved the couch in her bedroom to cover up blood on the carpet, turned the water on in her bathroom and closed the door, and put a chicken in a pot on the stove and turned the stove on. He left a note on the kitchen table saying, "Took Sean to the hospital" in case someone saw blood in the house. He changed his clothes, since they were bloody. He then took about $150 from her purse and left.

{¶ 23} He originally took her keys, thinking he would take one of her vans, and actually put his bag of clothes in the van, but could not get the van started. He got into Vernon Prince's car and drove off. Since he did not have a license plate, he stopped to steal a plate from a car in Garrettsville. To remove and transfer the plates to his car, he used the knife that he had stabbed his grandmother with.

{¶ 24} Upon direct questioning by the officers, Carter denied taking off his grandmother's clothes or raping her, but admitted she was wearing only a T-shirt when he left her. After Carter signed a waiver allowing his car to be searched, the knife was found in the car. He waived extradition and was brought back to Ohio for prosecution.

{¶ 25} Carter was indicted for one count of aggravated murder (R.C. 2903.01[B]) with three capital specifications (R.C. 2929.04[A][7]), aggravated burglary, aggravated robbery, and rape. He was also indicted on one count of aggravated burglary, one count of aggravated robbery, and one count of rape.

{¶ 26} After a jury trial, during which he absented himself from most of the proceedings, Carter was found guilty of aggravated murder and two of the capital specifications, aggravated robbery, and rape. The jury also found Carter guilty of aggravated robbery, rape, and the lesser-included offense of criminal trespass on the aggravated burglary charge, and Carter was sentenced to prison on these charges.

**{¶ 27}** After a penalty hearing, the jury recommended that the death sentence be imposed, and the trial court adopted the jury's recommendation.

**{¶ 28}** The cause is now before this court upon an appeal as of right.

————————————

*Dennis Watkins*, Trumbull County Prosecuting Attorney, and *LuWayne Annos*, Assistant Prosecuting Attorney, for appellee.

*Thomas E. Zena* and *John B. Juhasz*, for appellant.

————————————

***Per Curiam.***

**{¶ 29}** In this appeal, Carter raises fourteen propositions of law. For the reasons that follow, we reject each of his propositions of law and affirm each conviction and the death sentence.

Missing Element in Indictment

**{¶ 30}** In his first proposition of law, Carter argues that his death sentence is void because an element of the offense of rape was missing from the charge in the fourth count of the indictment. The fourth count alleged as follows: "THE JURORS OF THE GRAND JURY *of the State of Ohio, within and for the body of the County aforesaid*, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 14th day of September 1997, at Trumbull County, Ohio, SEAN M. CARTER did by purposefully compelling Veader Prince to submit by force or threat of force, in violation of the Ohio Revised Code, Title 29, Section 2907.02(A)(2), and against the peace and dignity of the State of Ohio [*sic*]."

**{¶ 31}** R.C. 2907.02(A)(2) provides that "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶ 32}** A comparison of the indictment and the statute reveals that the words "engage in sexual conduct" are missing from the indictment. The state concedes

7

that the indictment on the rape count is missing the "engaging in sexual conduct" language, but argues that even if this court were to find this to be reversible error, only the fourth count of the indictment would be affected.

**{¶ 33}** In the bill of particulars, the state specified as follows: "The defendant repeatedly beat the victim with his fists, stabbed her multiple times with a knife and he forcibly engaged in sexual conduct with the victim (specifically the defendant had anal intercourse with Mrs. Prince)." Carter never objected to the indictment and there is no indication that Carter was unaware of the charges against him.

**{¶ 34}** Crim.R. 7 provides in pertinent part:

"(B) Nature and contents

"The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. Each count of the indictment or information shall state the numerical designation of the statute that the defendant is alleged to have violated. Error in the numerical designation or omission of the numerical designation shall not be ground for dismissal of the indictment or information, or for reversal of a conviction, if the error or omission did not prejudicially mislead the defendant."

**{¶ 35}** Carter argues now that he did not have notice of the charges against him and was unable to defend himself. However, Carter never challenged the sufficiency of the indictment at any time before or during his trial. An appellate court need not consider an error that was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court.

*State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. As a result, such error is waived absent plain error. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. Plain error does not exist unless, but for the error, the outcome at trial would have been different. *Id.*

{¶ 36} The record reveals that of all the charges against him, Carter vigorously defended against the charge of rape. Carter challenged the state's forensic experts on evidence that supported the charge of rape and even sought appointment of his own expert to testify concerning the evidence of rape. His claim now that he did not have notice of the charges is without merit.

{¶ 37} Carter alleges that the error in the indictment is fatal error. Were this true, it would be fatal only as it relates to count four, the rape count. While Carter argues that this defect also affects the aggravated murder charge and the capital specification attached thereto, this argument lacks merit. If the state seeks the death penalty for a defendant who commits aggravated murder, the indictment charging the offense must contain at least one of the specifications enumerated in R.C. 2929.04(A)(1) through (9). R.C. 2929.04(A) provides: "Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt." That section then sets out nine different aggravating circumstances. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 456, 653 N.E.2d 285, 291-292.

{¶ 38} The form of the specification is governed by R.C. 2941.14(C), which requires that the aggravating circumstance " 'may be stated in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same.' " Thus, the language of the statute clearly provides that the specification is sufficient if the accused knows which subsection or which aggravating circumstance of the nine listed in R.C. 2929.04(A) has been alleged.

**{¶ 39}** Here, the aggravated murder count specifies that the victim was purposefully killed during the course of a rape, and specification three charges Carter under R.C. 2929.04(A)(7) with committing the offense during the course of a rape. Further, the trial court correctly instructed the jury as to all the elements constituting rape. The capital offense remains unaffected by this defect in the indictment.

**{¶ 40}** Furthermore, even as it relates to the rape count, appellant has not shown that he was prejudiced in the defense of his case by this error or that he would have proceeded differently had this error been corrected. Indeed, had the error been discovered, it was properly subject to amendment. Crim.R. 7(D); *State v. O'Brien* (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144, paragraph two of the syllabus.

**{¶ 41}** Carter had sufficient notice that he was charged with raping Prince and he was not prejudiced by the error in the indictment. Carter's first proposition of law is overruled.

Failure to Give Lesser-Included-Offense Instructions

**{¶ 42}** In his second proposition of law, Carter argues that the trial court erred by failing to give the jury lesser-included-offense instructions on aggravated murder (murder and manslaughter requested), aggravated robbery (theft requested), and rape (gross sexual imposition requested). The trial court denied these requests.[1] In *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus, this court set out the test used to determine whether one offense constitutes a lesser-included offense of another:

"An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also

---

1. The trial court did grant the defense request to instruct on criminal trespass as a lesser-included offense for aggravated burglary, and the jury did find Carter guilty of the lesser offense.

being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."

{¶ 43} An instruction on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; *State v. Palmer* (1997), 80 Ohio St.3d 543, 562, 687 N.E.2d 685, 702.

{¶ 44} **Aggravated Robbery.** Carter argues that the jury should have received a lesser-included-offense instruction because he did not take money until *after* Prince was dead.[2] Carter argues that he did not form the intent to take the money until after his grandmother was dead, and even then, only when he realized that he needed money. Carter supports his reasoning by noting that he took only one hundred and fifty dollars from Prince's purse, even though the purse contained approximately four hundred and fifty dollars.

{¶ 45} Carter was indicted for aggravated robbery under R.C. 2911.01(A)(1) and 2911.01(A)(3). Those sections provide as follows:

"(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

"(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

" * * *

"(3) Inflict, or attempt to inflict, serious physical harm on another."

{¶ 46} A "theft offense" is defined in R.C. 2913.02 as follows:

---

2. Carter did not raise any issue relating to the sufficiency or weight of the evidence concerning the aggravated robbery count.

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

"(1) Without the consent of the owner or person authorized to give consent;

"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

"(3) By deception;

"(4) By threat;

"(5) By intimidation."

{¶ 47} Theft carries a lesser penalty than aggravated robbery. Further, one element of aggravated robbery, R.C. 2911.01(A)(1), having a deadly weapon on or about the accused's person or under his or her control, is not required to prove theft. Thus, the first and third elements of the *Deem* test are clearly satisfied.

{¶ 48} The issue becomes whether aggravated robbery, as statutorily defined above, can ever be committed without theft, as statutorily defined above, also being committed. We answer that question in the affirmative because aggravated robbery can be committed in the course of an "attempted theft." R.C. 2913.02; 2923.02. Theft requires the accused to actually obtain or exert control over the property or services of another; attempted theft does not. Since theft is not a lesser-included offense of aggravated robbery, the trial court did not err by not providing a lesser-including-offense instruction.

{¶ 49} **Rape.** Carter argues that there was no "sexual conduct," *i.e.*, penetration, to the anus of the victim. Instead, Carter presented a theory at trial that the semen was deposited on the outside of the body and seeped into the anus. The evidence in the record strongly supported the state's theory that Carter's sperm, found in the victim's anus and positively identified through DNA testing, was placed there through the insertion of Carter's penis into the victim's anus. The evidence did not support an acquittal on the charge of rape.

**{¶ 50} Aggravated Murder**.  The distinguishing element of aggravated murder and murder is the commission of a murder during a felony.  The felonies charged were rape and aggravated robbery.  Here the evidence clearly supported the commission of a rape; therefore, the trial court properly denied a lesser-included-offense instruction on murder.  See *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576, 591-592.

**{¶ 51}** Carter also argues that the theft of money from the victim did not occur "while" the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the aggravated murder.  Appellant suggests that implicit in the meaning of the word "while," as it appears in R.C. 2929.04(A)(7), is a requirement that there be evidence of some type of motivational nexus between the aggravated murder and the underlying felony, in this case the aggravated robbery.

**{¶ 52}** This court has previously held that the robbery need not take place prior to or simultaneously with the murder and that a defendant "cannot escape the effect of the felony-murder rule by claiming that the aggravated robbery was simply an afterthought."  *State v. Biros* (1997), 78 Ohio St.3d 426, 451, 678 N.E.2d 891, 912; *State v. Williams* (1996), 74 Ohio St.3d 569, 577-578, 660 N.E.2d 724, 732-733.  Accordingly, it was not error to fail to instruct on the lesser-included offense of murder, as it related to the aggravated robbery offense.

**{¶ 53}** Carter's request for a voluntary manslaughter instruction was properly denied, since the evidence, including that the victim was stabbed eighteen times, fully supported a purposeful killing.  *State v. Palmer*, 80 Ohio St.3d at 562, 687 N.E.2d at 702; *State v. Raglin* (1998), 83 Ohio St.3d 253, 257, 699 N.E.2d 482, 487-488.

**{¶ 54}** Carter's second proposition of law is overruled.

Prosecutorial Misconduct

**{¶ 55}** Carter alleges in his third proposition of law that misconduct by the prosecuting attorney denied him a fair trial. However, trial counsel did not object to any of the alleged misconduct. "A claim of error in a criminal case cannot be predicated upon the improper remarks of counsel during his argument at trial, which were not objected to, unless such remarks serve to deny the defendant a fair trial." *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. In our view, the comments by the prosecutor did not deny Carter a fair trial.

**{¶ 56}** In his closing argument the prosecutor said, "And when we began this trial during the questioning by both sides, you all indicated that you could be neutral and fair and open-minded and look at the facts and decide this case on the evidence and the law. That's all either side can ask for. Obviously I represent a side, the State. *I believe in my side. I believe the evidence that we have that this defendant is guilty of all the charges. I wouldn't be here*." (Emphasis added.)

**{¶ 57}** Carter also alleges that the prosecutor erroneously characterized the defendant's explanation as to why he went to Prince's house on the night of the murder as "absolutely absurd."

**{¶ 58}** Further, Carter argues that the prosecutor impermissibly bolstered the testimony of Dr. Cox (the pathologist) concerning the bleeding in the victim's brain by stating, "*I think Dr. Cox's explanation is better than the other doctor's,* but you'll decide that as to why she has hemorrhaging in her brain." (Emphasis added.)

**{¶ 59}** Finally, Carter alleges that the prosecutor committed misconduct when he asked Major James Phillips of the sheriff's office questions concerning who issued the search warrants to obtain blood samples from Carter. Carter argues that the fact that Judge McKay, the trial judge, had signed the warrant to obtain the samples would indicate to the jury that the trial judge believed Carter was guilty.

14

**{¶ 60}** The test for prosecutorial misconduct is whether the remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused. Even if improper, the verdict will not be overturned unless the defendant was actually prejudiced by the impropriety. *State v. Lott* (1990) 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300. See, also, *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 318-319, 470 N.E.2d 883, 885-886. Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, 1078.

**{¶ 61}** Even assuming, *arguendo,* that the prosecutor's comments were improper, they did not deny Carter a fair trial. The comments during closing argument were isolated and tempered by other comments to the jury indicating that it was up to it to make the final determinations as to the facts. As for the final allegation of misconduct, it would be speculation to believe that the jury would assume that the trial judge thought Carter was guilty because he signed a search warrant to obtain Carter's blood samples. Carter has failed to show that any actions by the prosecutor denied him a fair trial. Carter's third proposition of law is rejected.

Incompetency to Stand Trial

**{¶ 62}** In his fourth proposition of law, Carter argues that he was incompetent to stand trial "because his paranoid personality did not permit him to trust his lawyers." The trial court appointed an expert to examine Carter, and a hearing on competency was held, after which the trial court determined that Carter was competent to stand trial.

**{¶ 63}** The standard for competency is set out in R.C. 2945.37(G), which provides: "A defendant is presumed competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's

present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial * * *."

{¶ 64} Carter does not argue that he was incapable of understanding the nature of the proceedings against him; instead, he focuses his argument on his inability to assist his defense counsel. During the first competency hearing, Dr. Stanley Palumbo opined, "With reasonable scientific certainty Mr. Carter is competent to stand trial. Mr. Carter understands the nature of the proceedings against him and does not suffer from any gross mental disorder that would interfere with his ability to participate in his defense. He does not suffer from any mood disorder such as depression, which would cause him to have trouble following a witness's line of statements or have the energy and interest in participating in his own defense in his own best interest."

{¶ 65} When questioned about Carter's relationship with his attorneys, and his not wanting to listen to his attorneys' advice, Dr. Palumbo commented, "It certainly sounds like he doesn't want to, but that's different from being able to."

{¶ 66} The trial court found Carter competent and denied a defense request for further examination. In his findings of fact, the court stated, "Dr. Palumbo testified that the Defendant does not trust his attorney, or any other attorney[;] however, Defendant's distrust of his attorney does not exhibit paranoid behavior since he distrusts all attorneys and not specifically his attorney."

{¶ 67} After the trial court found that Carter was competent, Carter entered a plea of not guilty by reason of insanity. The court appointed three experts to examine Carter for sanity at the time of the offense—Dr. Steven A. King, Dr. Robert Alcorn, and Dr. Stanley Palumbo.

{¶ 68} During Dr. King's interview with Carter, the doctor became concerned that Carter was not competent to stand trial. This concern prompted an

evaluation on that issue by the other two doctors, and a second competency hearing. Carter waived his presence at the hearing.

{¶ 69} Dr. King testified that Carter exhibited bizarre behavior during his interview and indicated that he wanted to kill Tony Consoldane, his attorney. King further testified that Carter's thoughts kept him from cooperating with counsel. In Dr. King's opinion, Carter was not able to assist in his own defense. On cross-examination, King admitted that the question of competence was a close call.

{¶ 70} Dr. Palumbo did not change his prior opinion of competence after he re-examined Carter. He acknowledged that Carter expressed anger and irritability with his attorneys, but added that it was not unusual for defendants to be upset with their attorneys.

{¶ 71} Dr. Alcorn also examined Carter concerning Carter's relationship with his attorney. Alcorn testified that Carter did not think his attorney was doing a very good job, and that that was not an uncommon reaction given the situation Carter was in. He determined Carter to be competent to stand trial.

{¶ 72} At the conclusion of the second hearing, the trial court again found Carter competent to stand trial, stating, "I would indicate for the record that the distrust and/or hostility that a defendant has with an attorney, his own attorney, does not necessarily equate with competence."

{¶ 73} Carter did not want to attend the court proceedings, indicating that he just wanted to enter a plea and get it over. Some evidence indicates that while awaiting trial, Carter attempted suicide. Otherwise, his unwillingness to attend the court proceedings and sometimes apparent disagreements with counsel were the only indications in the record that raised a question of competence to stand trial.[3]

---

3. The record indicates that Carter was not happy about being shackled for court proceedings. Defense counsel waived Carter's presence for some preliminary hearings, and Carter himself waived his right to be present at the second competency hearing. Prior to the defense opening statement, Carter asked if he had to go through trial, or could he just plead guilty. A hearing out of the jury's presence was held and Carter stated he did not want to attend the trial. The trial court indicated

Carter asks this court to disregard the opinions of the experts. A review of the proceedings does not warrant that action.

{¶ 74} Carter also argues that trial counsel did not vigorously pursue the issue of competence, arguing that they should have testified at the competency hearing concerning Carter's inability to cooperate with them. Given the record, such a finding would be speculative.

{¶ 75} The trial court's findings of fact fail to support Carter's claim that the court's decision was unreasonable, arbitrary, or unconscionable. Accordingly, there was no abuse of discretion. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. Carter's fourth proposition of law is overruled.

Ineffective Assistance of Counsel

{¶ 76} In order to prevail on a claim of ineffective assistance of counsel, Carter must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. See *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. Further, if it is easier to resolve the question by addressing the prejudice requirement, then the court is free to do so.

{¶ 77} Carter argues in his fifth proposition of law that counsel were ineffective because they failed to file a motion to dismiss, or a motion to correct the error in the fourth count of the indictment concerning the charge of rape. While counsel should have noticed the error in the indictment, the error would have

---

some concerns about his waiving his presence at trial and Carter lunged at the judge in order to be removed from the courtroom. Carter watched the remainder of the trial from another room by remote video. Throughout the remainder of the trial, defense counsel would report to the court each day that Carter still did not want to attend trial. Carter wanted to be in court for the closing arguments in the trial phase, but only if he could be unshackled, which one of his attorneys refused to consent to. Carter also absented himself from the penalty-phase proceedings.

properly been subject to amendment. Crim.R. 7(D); *State v. O'Brien, supra*, 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144, paragraph two of the syllabus. Further, Carter cannot show prejudice. The record reveals that of all the charges against him, Carter vigorously defended against the charge of rape. Defense counsel challenged the state's forensic experts on the evidence that supported the charge of rape and even requested appointment of his own medical expert. Carter has failed to prove ineffective assistance of counsel on this allegation.

**{¶ 78}** Carter's second allegation is that during the competency determination when the trial court offered to allow an MRI to be conducted on Carter, counsel should have pursued the testing for use in the penalty phase. This argument is speculative, since we have no way of knowing what, if anything, would have been discovered had the MRI been pursued. Carter has failed to prove prejudice. Establishing that would require proof outside the record, the report from the MRI. Such a claim is not appropriately considered on direct appeal. See *State v. Keith* (1997), 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47, 67, citing *State v. Scott* (1989), 63 Ohio App.3d 304, 308, 578 N.E.2d 841, 844.

**{¶ 79}** Carter's last allegation is that counsel failed to present argument concerning jury instructions on lesser-included offenses. However, counsel did make a request for a lesser-included-offense instruction for all charges and presented argument as to each. There is nothing in the record that would indicate that if counsel had presented additional arguments they would have been successful. As set forth in the discussion of the second proposition of law, even if a lesser-included-offense instruction should have been given on aggravated murder (robbery), the remaining felony of rape still would have supported the aggravated murder count.

**{¶ 80}** This proposition of law is overruled.

Inadequate Appellate Review

{¶ 81} Carter argues in his seventh proposition of law that his death sentence should be vacated because the appellate review process in Ohio is inadequate. Carter cites three reasons: the jury is precluded from considering mercy, the lack of meaningful proportionality review, and inadequate independent weighing of aggravating circumstances and mitigating factors. We have previously reviewed these issues and found them to be without merit. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216; *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030, 1037; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, syllabus.

{¶ 82} The United States Supreme Court has held that appellate review is an integral part of a state's capital punishment scheme. *Gregg v. Georgia* (1976), 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859, 888. Since *Gregg*, however, the court has not found a sentencing scheme unconstitutional due to the nature of the appellate review process engaged in by a state. Nothing in Carter's argument warrants overturning the death penalty scheme based upon the appellate review process in Ohio.

## Constitutional Amendment

{¶ 83} In his eighth proposition of law, Carter challenges the constitutionality of limiting direct review of death penalty cases solely to this court. These issues were decided by and are rejected on the authority of *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

## Mercy

{¶ 84} In his tenth proposition of law, Carter argues that Ohio's preclusion of the consideration of mercy in the death penalty process violates the state and federal Constitutions. The court did not err by refusing to instruct on mercy. This argument is rejected on the authority of *Lorraine*, 66 Ohio St.3d at 417, 613 N.E.2d at 216, and *Hicks*, 43 Ohio St.3d at 78, 538 N.E.2d at 1037.

## Death Penalty Violates Ohio Constitution

{¶ 85} Carter argues that this court has never analyzed the death penalty statute under the Ohio Constitution.  However, in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 179, 15 OBR 311, 324, 473 N.E.2d 264, 281, we specifically held that "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or *any provision of the Ohio Constitution*." (Emphasis added.)  Propositions of law eleven and fourteen are rejected.

Executions are Cruel; Request for a Moratorium

{¶ 86} In his twelfth proposition of law, Carter asks for a stay of his execution and a moratorium on executions in Ohio.  The basis for Carter's request is that a  number of persons were found to be wrongly convicted of capital offenses in Illinois, and that executions are irrevocable.  In *Gregg*, the United States Supreme Court held that the death penalty does not violate the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments.

{¶ 87} Carter has not pointed to anything specific concerning Ohio's application of the death penalty.  Even if there are persons on death row in Ohio who may be innocent of the crimes they are charged with, Sean Carter is not one of them.  The record is replete with overwhelming evidence of Carter's guilt and the concerns that may be present in Illinois are not present in this case.  This proposition of law is rejected.

Methods of Execution

{¶ 88} In his thirteenth proposition of law, Carter argues that the death penalty is unconstitutional under the federal and Ohio Constitutions because the methods used to carry out the sentence, electrocution or lethal injection, are cruel and unusual punishment.  While Carter argues that electrocution is cruel, this court and the United States Supreme Court have previously held that execution by electrocution does not violate the federal and Ohio Constitutions.  *In re Kemmler*

(1890), 136 U.S. 436, 443-444, 10 S.Ct. 930, 932, 34 L.Ed. 519, 522-523; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633.  The United States Supreme Court granted certiorari this term to a case that involved the issue of whether execution by electrocution violates the Cruel and Unusual Punishment Clause.  *Bryan v. Moore* (1999), ___ U.S. ___, 120 S.Ct. 394, 145 L.Ed.2d 306.  The court subsequently dismissed *Bryan* as improvidently granted after the Governor of Florida signed into law a bill allowing lethal injection as an option to the electric chair.  *Bryan v. Moore*, ___ U.S. ___, 120 S.Ct. 1003, 145 L.Ed.2d 927.  Carter fails to cite any case in which lethal injection has been found to be cruel or unusual punishment.  This proposition of law is overruled.

Constitutionality of the Death Penalty

{¶ 89} In his ninth proposition of law, Carter argues that Ohio's capital sentencing scheme violates the federal and Ohio Constitutions.  We have examined and disposed of the same issues presented here.  *State v. Jenkins*, *supra*; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Steffen, supra*, 31 Ohio St.3d at 125, 31 OBR at 285, 509 N.E.2d at 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Coleman, supra*, 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633.  This proposition of law is rejected.

Scope of Proportionality Review

{¶ 90} In his sixth proposition of law, Carter asks us to revisit *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus, concerning the universe of cases to be considered by an appellate court when conducting the proportionality review required by R.C. 2929.05(A).  Carter presents no new arguments concerning this issue and, therefore, based on *Steffen*,

this proposition of law is rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

INDEPENDENT SENTENCE REVIEW

{¶ 91} Carter argues that his death sentence is neither appropriate nor proportionate. His arguments will be considered in performing the independent sentence review.

{¶ 92} Carter was convicted of aggravated murder during the course of an aggravated robbery and rape. The jury and the trial court considered two aggravating circumstances under R.C. 2929.04(A)(7)—one involving the rape and one involving the aggravated robbery. The state proved beyond a reasonable doubt that Carter raped his adoptive grandmother, and we will consider the rape specification in the weighing process. The state also proved beyond a reasonable doubt that Carter committed aggravated robbery, and we will consider the aggravated robbery specification in the weighing process.

{¶ 93} The nature and circumstances of the offense offer nothing in mitigation for Carter. R.C. 2929.04(B). R.C. 2929.04(B) also requires us to consider seven potential mitigating factors. Most are clearly inapplicable. Prince did not induce or facilitate the crime, R.C. 2929.04(B)(1); Carter did not commit the offense while under duress or coercion, R.C. 2929.04(B)(2); Carter was not, because of a mental disease or defect at the time of the offense, unable to appreciate the criminality of his conduct or conform his conduct to the law, R.C. 2929.04(B)(3); Carter does not lack a history of prior criminal convictions or delinquency adjudications, R.C. 2929.04(B)(5); and Carter was not a mere participant, he was the principal, the only, offender, R.C. 2929.04(B)(6). Accordingly, the only statutory mitigating factors appropriate for our review are Carter's youth, R.C. 2929.04(B)(4), and other relevant factors, R.C. 2929.04(B)(7).

{¶ 94} Carter's history, character, and background offer evidence in mitigation of the death sentence. Carter's biological father was never present in his

life and his mother was psychotic. Carter's mother moved with her two children to Trumbull County to be near relatives; however, she was referred to the local children's services agency. When a caseworker investigated, she found Carter's mother incoherent and carrying on a conversation with herself. Carter and his siblings were dirty and had enlarged stomachs. There were no signs of physical abuse, although Carter was observed with his ankle tied to the leg of a couch. The children were removed from their mother and placed in foster care.

{¶ 95} Nancy Dorrian, a psychologist, had evaluated Carter between the years 1983-1986. Dorrian discussed that when she first examined Carter, he was withdrawn and his affect was flat. He had no attachment to his biological mother, and very few verbal skills. Dorrian explained that due to insufficient stimuli in his first year of life, he had problems relating to people. However, he showed dramatic improvement after being placed with a foster mother, Ida Magee. Unfortunately, Magee was unable to provide a permanent home for Carter. A permanent placement was attempted in 1987 with the Smith family, but the adoptive parents were critical towards Carter's intellectual handicaps and emotionally abusive. He was returned to Magee in 1988.

{¶ 96} Dorrian recommended that Carter stay with Magee. She was not able to economically support Carter, so she could not adopt him. Therefore, in 1989, when Carter was nine years old, he was placed permanently with the Carters and adopted by them approximately one year later.

{¶ 97} Clinical psychologist Sandra B. McPherson evaluated Carter and testified in the penalty phase. Dr. McPherson stated that she did not think the Carters had been fully informed about Carter's problems or potential problems. Dr. McPherson stated that the Carter home included a number of "danger zones" within it, "including some highly inappropriate sexual materials, the presence of an older male whose behavior was problematic and sexually tinged, and the presence of females with resulting sexual stimulation." Even so, Carter adjusted well to the

24

Carter family, exhibiting no behavioral problems, and getting A's and B's in school during his first few years with the Carters.

{¶ 98} Dr. McPherson stated that given his birth mother's history, Carter has the genetic potential for schizophrenia, although that does not usually manifest itself until the twenties, and Carter was eighteen when the crime was committed. He began experimenting with drugs and alcohol in his early teens, which activity resulted in Carter's early contact with the juvenile court.

{¶ 99} Dr. McPherson diagnosed Carter as having an antisocial personality disorder and borderline personality disorder with psychopathic features. She indicated this was a very serious set of conditions. *She explained that Carter had an "attachment" disorder, which results when children are not loved, and therefore do not develop the capacity to love. Dr. McPherson stated that* all areas of functioning were below par*, even though Carter's IQ was in the normal range.*

{¶ 100} Dr. McPherson stated that Carter "does not have now and has never had any true capacity to relate to other human beings on an interdependent or mutual or self-enhancing fashion. He does not understand how other people think or feel. He has the capacity for hatred, which at bottom is self-hatred of substantial proportion. * * * Sean Carter was both born and made, and neither of those processes was under his control." Dr. McPherson also stated that Carter did not have a mental disease or defect that substantially affected his conduct.

{¶ 101} His history and background, including his psychological problems, are entitled to some weight in mitigation. *State v. Rojas* (1992), 64 Ohio St.3d 131, 592 N.E.2d 1376; *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 428, 692 N.E.2d 151, 166, 169-170.

{¶ 102} Carter was eighteen at the time of the offense, which is a statutory consideration under R.C. 2929.04(B)(4), and entitled to some weight. *Raglin*, 83 Ohio St.3d at 273, 699 N.E.2d at 498.

**{¶ 103}** When each aggravating circumstance is weighed against these mitigating factors, it outweighs them, beyond a reasonable doubt.

**{¶ 104}** A determination of whether the death sentence is appropriate includes a proportionality review of similar cases. We have reviewed various cases, including two with the sole aggravating circumstance of rape. In *Phillips*, 74 Ohio St.3d at 104, 656 N.E.2d at 671, and in *State v. Mason* (1998), 82 Ohio St.3d 144, 170, 694 N.E.2d 932, 957, this court affirmed the death sentence even though both defendants were young, lacked significant criminal history, and had emotional and mental deficiencies. Nothing in Carter's case indicates that his death sentence is disproportionate to those in *Phillips* or *Mason*.

**{¶ 105}** Finding the death penalty appropriate and proportionate, we affirm the sentence of death. The judgment of the court of common pleas is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs separately.

DOUGLAS and F.E. SWEENEY, JJ., concur in judgment only.

_____

**PFEIFER, J., concurring.**

**{¶ 106}** We are charged to independently weigh each sentence of death. Among the factors we consider are whether the death sentence is appropriate and proportionate. When petty theft (for that is what taking $150 is) elevates a murder to a felony-murder capital offense, I believe a death sentence is not appropriate. See Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death (1990), 31 B.C.L.Rev. 1103; Ledewitz, The New Role of Statutory Aggravating Circumstances in American Death Penalty Law (1984), 22 Duq.L.Rev. 317. I could not with a good conscience have affirmed a death sentence based solely on the aggravated-robbery specification.

{¶ 107} Here, however, there is a second felony-murder specification, which was proved beyond a reasonable doubt. Based on that specification, the death sentence imposed is both appropriate and proportionate. Accordingly, I concur with the majority opinion, with respect to the convictions and the death sentence.

————————————