OPINION
This case is before us on the appeal of Patricia Woods from her conviction on charges of complicity to commit aggravated robbery. Woods was convicted after a jury trial and was sentenced to nine years imprisonment for the robbery and three years on a firearm specification. The latter sentence was to be served consecutive to and prior to the sentence for the aggravated robbery conviction.
In support of her appeal, Woods raises the following assignments of error:
I. The trial court erred to the prejudice of the Appellant by denying Appellant's motion to suppress in that Appellant's statements were not voluntarily, knowingly, or intelligently given due to Appellant's physical condition.
II. The trial court erred to the prejudice of the Appellant by refusing to give to the jury an instruction on lesser-included offenses of theft and robbery.
III. Appellant's conviction was against the manifest weight of the evidence.
After considering the record, including the transcripts of the suppression hearing and the jury trial, we find the assignments of error without merit. Accordingly, the judgment of the trial court will be affirmed.
 I
The charge against Woods arose from the robbery of Wilton "Rabbit" Williams on December 15, 2000. At about 4:00 p.m. that day, three men held up Williams at gunpoint while he was sitting in his car. Shots were fired into the car, but Williams was able to drive away. However, he crashed his car into another vehicle a few blocks away. Unbelievably, the people who shot Williams ran up to the wrecked car and took his wallet and money as he lay bleeding. Williams ultimately died from the injuries he sustained.
Woods was placed at the scene by an eye-witness, who identified her as a woman who was walking away from the car at the time Williams was accosted by the armed men. As a result, the police located Woods later that evening and took a statement. Woods admitted knowing Williams, and said she had contacted him that day to pay $50 on a debt she owed. Woods had been acquainted with Williams for about eighteen years, and had borrowed money from him on various occasions. At the time, she owed him at least $1,200. Woods also admitted knowing the persons who robbed Williams, and identified them from a photo spread.
After the initial interview, Woods was returned to the Best Inn, where she was living. The investigation then continued. Eventually, a warrant was issued for Woods' arrest, on a charge of complicity to commit aggravated robbery, and she was arrested on January 24, 2001. Following the arrest, Woods received the customary explanation of rights. She then gave another statement to the police. Initially, she repeated a scaled down version of the story she told the first time, i.e., that she had met Williams to make a payment and three men she also knew happened to come up and shoot him. When the detective told Woods that this story was unbelievable, she admitted to being with the three men (known as Geno, Twan, and Greedy Greg) before the shooting. She also admitted calling Williams to arrange a meeting. According to Woods, the three men were just supposed to point guns at Williams and rob him; she did not think they would kill him.
The next day, Woods asked to speak again with Detective Burke, who had taken her two earlier statements. Burke read Woods her rights and obtained another waiver. During this interview, Woods stated that one of the men (Geno) had been asking her for some time to set up Williams, so they could rob him. She admitted seeing guns before the robbery, but thought they were only going to point the guns at Williams. Woods denied actually seeing the shooting, as she ran around the corner. She did hear shooting, but when she came back, everyone was gone. A short videotape was made at the end of this statement.
At the suppression hearing, Williams testified that she was under the influence of heroin when she gave the first statement after her arrest. She had been using heroin for about six months, and consumed $60 to $100 worth of drugs per day. She claimed she was confused and only understood bits and pieces of what Detective Burke said to her. The following day, when Woods gave the second statement, she was very sick from heroin withdrawal. Woods indicated that she started to get sick during the night. At that time, paramedics at the jail calmed her down and gave her medication. Woods submitted medical records from the jail to substantiate her claim that she had been ill.
In contrast, Detective Burke testified that nothing about Woods' demeanor on the day he interviewed her revealed that she was under the influence of any drug or alcohol. Although Woods was nervous and upset about being arrested, she spoke fluently and did not have slurred speech. When Burke asked questions, Woods responded appropriately. Burke did not have problems understanding her and saw nothing to indicate that she did not understand what was happening. On the second day, Woods' demeanor was better. She had spent the night in jail and appeared more rested. She was not as upset about being arrested and was not nervous. Again, Burke saw nothing about Woods' mannerisms to show that she did not understand or was reluctant to continue with the interview.
After hearing the above testimony (about Woods' demeanor and the facts surrounding the interview), the trial court overruled the motion to suppress. Woods claims the court erred because her rights were not voluntarily given due to her physical condition at the time of the interrogation.
When we review suppression decisions, we do not evaluate credibility. Instead, we decide if the trial court properly applied the law. Statev. Woods (1996), 113 Ohio App.3d 240, 244. Therefore, we "accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." State v.Retherford (1994), 93 Ohio App.3d 586, 592.
The prosecution has the burden of proving that a defendant voluntarily, knowingly, and intelligently waived Miranda rights, and that any confession was voluntary. State v. Phillips (Aug. 11, 2000), Montgomery App. No. 18049, unreported, 2000 WL 1133249, p. 3. In either event, the same test applies, i.e., "whether the actions are voluntary under the totality of the circumstances, `including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" Id. (citations omitted).
We have previously stressed that the "totality of the circumstances analysis is triggered by evidence of police coercion." Id., citing Statev. Clark (1988), 38 Ohio St.3d 252, 261. In Phillips, we noted that a "suspect's impaired mental condition at the time of the waiver and the confession has some bearing on the issue of the voluntariness but only as to whether police officers deliberately exploit the suspect's mental condition to coerce the waiver and confession." 2000 WL 1133249, p. 3 (citations omitted).
We see no evidence in the record to indicate that Detective Burke deliberately exploited Wood's mental condition to obtain a waiver of rights or confession. In the first place, Woods did not say that she told Burke that she had used heroin shortly before the first interview or that she was suffering from withdrawal at the time of the second interview. Burke did testify that Woods openly told him that she had a drug habit. However, she did not tell him anything about having recently used drugs. As we mentioned, Burke also said that Woods did not appear to be under the influence of drugs or alcohol.
Nonetheless, even if Woods had given Burke such information, the record simply lacks any evidence of coercion. Woods admitted that Burke did not threaten her in any way. Instead, he simply told her that she was in serious trouble (an obvious point). He also told her that he could not help her if she did not tell him everything. Burke did not deny making this statement. In fact, he admitted telling Woods that he could not do anything for her unless she was truthful. Woods did not say what kind of "help" was implied. Compare State v. Sutphin (June 30, 1999), Greene App. No. 98CA140, unreported, 1999 WL 961291, p. 1 (officer was alleged to have promised defendant that his van would be returned to his wife if he waived his rights and confessed). See, also, State v. Edwards (1976),49 Ohio St.2d 31, 39, vacated in part on other grounds (1978),438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (promise that the court would be lenient if defendant told the truth does not make waiver of rights involuntary as a matter of law).
Based on the above facts, we find no evidence of coercion. We also note that Woods admitted signing both forms waiving her rights. As the Ohio Supreme Court has said, "[a]n accused's signed waiver form is strong proof that such waiver was valid." State v. Nields (2001), 93 Ohio St.3d 6,14. Moreover, Woods specifically testified that she could understand and answer questions when she was high. She also testified that she understood what Burke said during the interview on the day after her arrest — when she was no longer under the influence of drugs, but was ill from withdrawal. Notably, on this occasion, Woods asked to speak to Burke. In fact, Burke had not even intended to speak further with Woods. However, he interviewed her a second time, at her request.
To support the claim that her waiver of rights was not knowingly or intelligently made, Woods cites State v. Gardner (May 7, 1981), Cuyahoga App. No. 43080, unreported, 1981 WL 4941. In Gardner, the defendant contended that his statement was involuntary, among other reasons, because he was suffering from heroin withdrawal when he was questioned. According to Woods, the Gardner court relied particularly (in rejecting suppression) on the fact that no jail records indicated that the defendant either required or was given medical treatment. As a result, since the medical records in this case reveal that Woods was given medical treatment, Woods believes her statement was involuntary. We disagree.
In the first place, lack of medical treatment was simply one of several factors the court considered in Gardner. This is consistent with the requirement of evaluating the totality of the circumstances, and does not constitute a holding that where medical treatment is given, a confession or statement will, therefore, be rendered involuntary. In this regard, the court in Gardner considered a number of factors, including: lack of physical deprivation or threats; the short length of interrogation (only 45 minutes); the officers' testimony that the defendant appeared normal and understood his rights; and the fact that the defendant made no medical complaints to the officers while being questioned. 1981 WL 4941, p. 5. Ironically, the same factors exist in the present case. As we said, the mere fact that Woods took heroin before the first interview, or may have been withdrawing from heroin at the time of the second interview, does not, by itself, indicate that her statements were involuntary. Accordingly, the trial court did not err in overruling Woods' motion to suppress.
In light of the preceding discussion, the first assignment of error is overruled.
 II
The second assignment of error is based on the trial court's rejection of Woods' request for a jury instruction on the lesser-included offenses of theft and robbery. As we mentioned, Woods was charged with aiding and abetting another in committing aggravated robbery. See R.C. 2923.03(A)(2) (complicity). Under the complicity statute, the elements of the principal offense are imputed to the aider and abettor. State v. Letts
(June 22, 2001), Montgomery App. No. 15681, unreported, 2001 WL 699537, p. 3. Consequently, the State was required to prove the elements of aggravated robbery in order to convict Woods, and the jury was charged on those elements. Woods contends that robbery and theft are lesser-included offenses of aggravated robbery, and that the jury should have been charged on these offenses as well.
In responding to Woods' argument, the State first points out that theft is not a lesser-included offense. We agree with the State, as the Ohio Supreme Court has specifically said that theft is not a lesser-included offense of aggravated robbery. See State v. Carter (2000),89 Ohio St.3d 593, 601.
The State begins its next response by conceding that robbery is a lesser-included offense of aggravated robbery. Despite this fact, the State contends that a robbery instruction was not required in this case because the evidence would not reasonably support an acquittal on the aggravated robbery charge.
In State v. Merriweather (1980), 64 Ohio St.2d 57, the Ohio Supreme Court held that robbery is not a lesser-included offense of the crime of aggravated robbery. Id. at syllabus. However, the Fourth District Court of Appeals has concluded that the Ohio Supreme Court would findMerriweather inapplicable to offenders charged with aggravated robbery, due to substantial changes in the criminal law under Senate Bill 2. SeeState v. Schoonover (Sept. 21, 1998), Adams App. No. 97 CA 647, unreported, 1998 WL 652549, p. 4. Accordingly, the Fourth District Court of Appeals held in Schoonover that robbery is now a lesser-included offense of aggravated robbery. Id. at 5. After consideringMerriweather, the pre-Senate Bill 2 law, and the amendments in Senate Bill 2, we agree with the analysis and holding in Schoonover. Specifically, the result in Merriweather was based on the fact that the existing version of aggravated robbery did not include an element concerning force or the threatened use of force. 64 Ohio St.3d at 59. However, that is no longer true, as the present version of R.C.2911.01(A)(1) mentions force, i.e, having a deadly weapon and displaying, brandishing, or using it.
Although robbery is a lesser-included offense, a trier of fact will not be allowed to consider such an offense if "the evidence adduced on behalf of the defense is such that if accepted by the trier of the facts it would constitute a complete defense to all substantive elements of the crime charged." State v. Nolton (1969), 19 Ohio St.2d 133, syllabus. In considering if a charge on a lesser-included offense should be included, the Ohio Supreme Court has also said that:
 [i]f the trier of fact could reasonably find against the state and for the accused upon one or more of the elements of the crime charged and for the state on the remaining elements, which by themselves would sustain a conviction on a lesser-included offense, then a charge on the lesser-included offense is required. * * *
 Conversely, if the jury could not reasonably find against the state on an element of the crime, then a charge on a lesser-included offense is not only not required, but is also improper.
 State v. Kilby (1977), 50 Ohio St.2d 21, 24-25.
At trial, Woods' defense was that she had no idea that the three men she was with either had guns or intended to rob Williams. Woods gave the following account of events. The day before the robbery, Woods had asked one of the men (Geno) to take her to a credit union in downtown Dayton to open an account. When Geno showed up the next day, two other men (Twan and Greedy Greg) were in the car. Woods and the three men then drove to the credit union. The men waited in the car while Woods went inside the credit union. Subsequently, they began to drive to a branch bank in Kettering. However, on the way to the bank, Woods realized she had left her identification at the credit union and would not be able to cash a check. Geno then suggested that Woods call Williams to get cash. Since Woods had borrowed money from Williams in the past, she agreed to call. Woods then called Williams and arranged to meet him at Fifth and Henry Streets, in Dayton.
When Woods called Williams, she knew that she owed him money and that he would not loan her more unless she made a payment. However, Woods did not have any money in her bank account. Consequently, she was going to write Williams a bogus check, both for the payment and for the cash she needed.
The three men dropped Woods off at Fifth and Henry, and she went into the American Saloon to watch for Williams. When Williams arrived, Woods went out and got into his car. Woods told Williams she needed to cash a check because she had forgotten her identification. Williams offered to take her back downtown, but she told him the bank was getting ready to close. Williams then told her to call the bank, and if there was enough time, he would take her back. As a result of this conversation, Woods went into the American Saloon to call. However, she did not have the correct change and again went out to Williams' car. At that point, Geno, Greg, and Twan pulled up. Greg had a gun and pointed it at Williams head, demanding money. When Woods saw that the men had guns, she ran toward the bar. When she got around the corner, she heard shots go off. Another person she knew happened to drive by at that point, and gave her a ride away from the scene.
As we said, Woods was indicted for aiding and abetting another to commit aggravated robbery, a violation of R.C. 2911.01(A)(1). The relevant substantive elements of aggravated robbery are that:
 [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.
In comparison, the substantive elements of robbery are that:
 [n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control;
 (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
 (3) Use or threaten the immediate use of force against another.
R.C. 2911.02(A).
The only difference between the two crimes is that the jury would not have had to find that a deadly weapon was displayed, brandished, or used, in order to convict Woods of robbery. Nonetheless, robbery still requires the offender to have a deadly weapon on or about the offender's person or under the offender's control (or to threaten or use force). In this case, there was no evidence that the robbers simply had a deadly weapon under their control. In fact, Woods testified that she saw Greedy Greg point a gun at Williams' head. Based on Woods' own testimony, the robbers clearly brandished the gun, at a minimum.
Furthermore, Woods' theory was not that the robbers failed to use or brandish a deadly weapon, nor was it that the robbers failed to have a deadly weapon under their control. Her defense instead was that she did not know the men had weapons or that they intended to rob anyone. If the jury believed Woods' account, it would not have convicted her of either robbery or aggravated robbery. Therefore, the jury could not have found against the State and for Woods on one or more elements, which by themselves would have sustained a conviction for robbery. Kilby,50 Ohio St.2d at 24-25. As a result, an instruction on robbery was not required.
Arguably, a jury might possibly have found Woods guilty of attempted theft or of attempting to pass a bad check. See R.C. 2913.11(A) and R.C. 2913.02. However, these were not crimes for which Woods was indicted, and they are not lesser-included offenses of robbery.
Accordingly, the trial court correctly refused to instruct the jury on robbery. Since the trial court did not err in this regard, the second assignment of error is overruled.
 III
In the third assignment of error, Woods claims that the judgment was against the manifest weight of the evidence. This claim is based on alleged inconsistencies in the testimony of State witnesses.
When an appellate court considers manifest weight challenges, it sits as a "`thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." State v. Thompkins (1997),78 Ohio St.3d 380, 387 (citations omitted). In such situations,
 "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
Id.
After reviewing the record, we do not find that the jury clearly lost its way. The testimony of the State witnesses, if believed, was more than adequate to convict Woods. An impartial eye-witness (Brian Burns) placed Woods at the scene of the robbery. Although Woods did admit being at the scene, Burns contradicted her testimony in several important respects. First, Burns described Woods as walking away from the scene, not running. Further, shortly after the shooting, Burns saw Woods come back around the corner. When Burns yelled at Woods that she might want to stick around, she began running toward a blue Volkswagen. At that time, Woods appeared to be in a hurry, but did not appear to be upset. Instead, she was calm. This is not consistent with a reaction to an unexpected robbery and possible shooting of a friend.
Further contradictions to Woods' testimony came from a State witness who was in the American Saloon that day. This witness (also an impartial observer) saw Woods walk down Fifth Street, turn the corner on Henry Street, and come into the bar. Woods then walked to the front of the bar and looked out the window for about five minutes. She appeared nervous. A blue car then came down the street slowly. At that point, Woods went out the front door of the bar and got into the car. A few minutes later, a police helicopter was in the area and the area was taped off. This testimony is inconsistent with Woods' claim that she returned to Williams' car from the American Saloon before the shooting and then (without going back into the American Saloon) happened to see a blue Volkswagen coming down the street.
Woods own son, Harley Stevens, also contradicted her testimony. Stevens indicated that his mother had talked in November, 2000, about having to pay Williams back money that she had borrowed. She said she needed to get paid and that she needed to hit something big. According to Stevens, Woods more or less said that she wanted to set up Williams to get his money. These conversations occurred two or three times.
At the time of the robbery, Stevens was living with his mother at the Best Inn. When Stevens came back to the hotel the night of the robbery, his mother told him that Williams was dead, and that Greedy Greg had shot him. When Woods said this, she was real jumpy and was crying. Later that night, Woods said, "I hit the jackpot, I got paid." She was referring to the money that she got from Williams. At trial, Woods denied making this statement to her son.
Stevens did indicate that he thought his mother was kidding when she said she hit the jackpot, because it did not sound like her. Stevens also said he did not see his mother with any money or credit cards. However, the jury was entitled to give weight to this testimony. Woods' statement can certainly be construed as an admission of her involvement in the crime.
Another State witness, Kimberly Bertron, also testified about conversations in which Woods talked about "doing a lick" on Williams, i.e., stealing his money. These conversations took place on several occasions during the summer before the robbery. On cross-examination, Bertron said she did not take what Woods said "to heart," because Woods was upset at the time. However, on redirect examination, Bertron also said that she did not think Woods was joking. To the contrary, she thought Woods was in a desperate situation at the time, and she took Woods' comments that way. Again, the jury could appropriately give weight to this testimony. We note that Bertron's testimony does support the theory that Woods set Williams up for a robbery because she needed money.
Moreover, Woods admitted in her own testimony that Geno had been asking her for months to set up Williams. According to Woods, she refused because too many people could hurt someone for doing something like that. Whether the jury believed this depends on its view of Woods' credibility. At a minimum, Woods' testimony verifies that the issue of setting up Williams was raised.
Finally, Detective Burke testified about various statements Woods made about the crime. After Woods was arrested, she told Burke that she had called Williams and arranged to meet him. However, the three men were just supposed to point the guns at Williams and rob him. Woods stated that she did not think they would kill him. In the second interview after the arrest, Woods wanted to reinforce that Geno had been asking her for some time to set up Williams. She also wanted to reinforce that she saw the guns, but just thought they were going to point the guns at Williams and rob him. She had no idea they were going to kill Williams.
At the time of the robbery, Woods was unemployed, used $60 to $100 worth of heroin daily, and had no means of support other than social security survivor benefits, and the split, if any, she got from investing social security money in the sale of crack cocaine. Woods admitted that she had no money in her bank account the day of the robbery. The men Woods was with were also involved in drugs. And finally, Woods also knew that Williams always carried money. Under the circumstances, the scenario of Woods setting Williams up for a robbery is very plausible.
Ranged against this evidence is Woods' own account, which we discussed earlier. Although Woods denies and disputes the evidence from other witnesses, including her own son, the fact is that ample evidence existed to support the conviction. This is not a situation where a reversal on manifest weight grounds is warranted. Instead, the jury simply had a choice between two explanations of a defendant's involvement, and found one explanation more credible than the other.
In light of the preceding discussion, the third assignment of error is without merit and is overruled.
Accordingly, since all assignments of error have been overruled, the judgment of the trial court is affirmed.
GRADY, J., and YOUNG, J., concur.