OPINION
Appellant Steven T. Smith appeals the November 16, 2000, Judgment Entry of the Richland County Court of Common Pleas which dismissed his petition for post conviction relief.
 STATEMENT OF THE FACTS AND CASE
The following facts give rise to this appeal:
 Kesha Frye was the mother of Autumn Carter. Autumn was nearly six months old at the time of her death. Kesha, Autumn, and another daughter, Ashly Carter, shared an apartment with defendant-appellant Steven Smith [hereinafter appellant].[1] Appellant is an alcoholic.
On the evening of September 28, 1998, appellant put Autumn to bed at 10:15 P.M. Subsequently, Kesha looked in on Autumn and noted that Autumn was wearing pink pajamas. Kesha then put Ashly to bed at 10:30 P. M. A short time thereafter, Kesha and appellant had sexual relations in their upstairs bedroom. Afterwards, appellant, who had been drinking earlier, went downstairs to watch TV and continued drinking. Appellant was wearing cut off jean shorts. At 11:00 P.M. Kesha checked on her daughters, noted that both were still wearing their pajamas and went to bed.
At approximately 3:22 A.M. on September 29, 1998, Kesha was awakened when appellant placed Autumn in bed with her. Autumn was naked and so was appellant. Kesha immediately noticed that there was something wrong with Autumn. Kesha put her hand on the child's stomach and found she was not breathing. Kesha told appellant that he had killed her baby.
Kesha picked Autumn up, wrapped her in a blanket, got Ashly and ran to a neighbor's apartment. Police and a rescue squad were summoned. Paramedics arrived and attempted to revive Autumn. However, Autumn was later declared dead at Med Central Hospital.
When police arrived at Kesha's apartment, they noticed that the television was very loud. The officers had to turn the television down because it was so loud. They also noticed that there was material from a baby's diaper on a table, the floor and other places scattered around the room and that it looked like a baby diaper had been shredded. Jean shorts were found under the baby swing and pink pajamas were found nearby on the floor.
The coroner, Marvin S. Platt, M.D., testified that the causes of death were compression asphyxia, "which means that the child could not breathe because there was compression applied to her body", and a blunt injury to the head. TR 1472. Dr. Platt testified that the injuries were consistent with and indicated that the child had been lying on her abdomen on a cloth-like surface, which resulted in abrasions or the rubbing of the surface of the skin. It was his opinion that the child was resisting while lying on the front of her body so that the face became abraded and bruised. There were indications that during the process, the child was attempting to turn her head. The child was shaken with such force that she suffered a brain hemorrhage. Further, Autumn's blood was found on two of the cushions of the couch. Patches of hair torn from Autumn's head were found strewn around the room.
Evidence showed that while lying on top of Autumn, holding her face into the couch seat cushions, appellant forcefully penetrated her or attempted to penetrate her both anally and vaginally. TR 1482, 1485-1486, 1512, 1662. Autumn suffered circumferential bruising around her anus. Her vaginal opening was determined to be abraded and more than ten times larger than expected for her age. The force used to push Autumn's face into the couch caused the texture of the couch fabric to be imprinted upon her face.
Before the police could arrive at the scene, appellant was seen placing a trash bag into a dumpster. It was later discovered that the trash bag contained a torn baby diaper, beer cans and a red shirt.
A test of appellant's blood, drawn at approximately 11:00 A.M. on September 29, 1998, showed that appellant's blood alcohol content was .123%. Further, in a recorded statement to police, appellant denied any recollection of events from around 11:15 P.M. on September 28th through 3:25 A.M. on September 29th.
Appellant was indicted on November 5, 1998, on one count of aggravated murder, the victim being under the age of 13, in violation of R.C.2903.01(C), (Count I), and one count of aggravated murder while committing or attempting to commit rape, in violation of R.C.2903.01(B), (Count II). Both counts included the following specifications: the offense was committed while committing or attempting to commit, or fleeing immediately after committing or attempting to commit rape and appellant was the principal offender; the victim was under the age of 13 at the time of the offense and appellant was the principal offender; the offense was committed with a sexual motivation; the offender is a sexually violent predator. An arraignment was held on November 18, 1998. The matter proceeded to a jury trial, conducted March 8, 1999. On March 17, 1999, the jury returned a verdict finding appellant guilty of the charge of aggravated murder of a person under the age of 13. Further, the jury found appellant guilty of aggravated murder of a person committed while committing or attempting to commit rape. The jury also found each of the following specifications: the aggravated murder was committed while appellant was committing or attempting to commit rape and that appellant was the principal offender; the aggravated murder was of a person under 13 years of age at the time of the crime and that appellant was the principal offender; the aggravated murder was committed with a sexual motivation.
On March 22, 1999, after the conduct of the mitigation phase of the trial, the jury returned a verdict finding that the prosecutor had proved that the aggravating circumstances outweighed all the mitigating factors beyond a reasonable doubt and recommended the imposition of a death sentence. On March 25, 1999, the trial court filed a sentencing opinion. The trial court found that it was persuaded, after an independent review of the evidence, that the jurors did correctly discharge their duty and that they did return the verdict required by law and the evidence. The court consequently found it must sentence appellant to death. On March 25, 1999, appellant appeared in the trial court, and was sentenced to death for the aggravated murder of Autumn Carter.
On May 13, 1999, appellant filed a Notice of Appeal with the Ohio Supreme Court.[2] On December 22, 1999, the Ohio Supreme Court remanded the matter to the trial court for an election of which aggravated murder count the appellant was sentenced on and to correct the record accordingly. Thereafter, on January 11, 2000, the trial court sentenced appellant "under Count II, Felony Murder Only" [R.C.2903.01(B)]. Judgment Entry, January 11, 2000.
On August 18, 2000, appellant filed a post conviction petition in the trial court. Subsequently, on August 24, appellant filed a Motion for Discovery and a Motion for a Court Order to Allow Medical Procedures and to Amend the Post conviction Petition. On September 1, 2000, appellant filed a First Amendment to the Petition to Vacate or Set Aside Judgment and/or Sentence.
On November 16, 2000, the trial court overruled appellant's Motion for Discovery. The trial court further overruled appellant's Motion to Allow Medical Procedures and denied appellant's Motion for Leave to Amend the Post conviction Petition. The trial court went on to overrule appellant's August 18, 2000, Post conviction Relief Petition together with the September 1, 2000, First Amendment.[3]
It is from the November 16, 2000, Judgment Entry that appellant presents this appeal, raising the following assignments of error:
 ASSIGNMENT OF ERROR I THE TRIAL COURT ERRED BY DISMISSING APPELLANT'S POST CONVICTION PETITION, WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND SUPPORTING EXHIBITS TO MERIT AN EVIDENTIARY HEARING AND DISCOVERY.
 ASSIGNMENT OF ERROR II OHIO'S POST CONVICTION PROCEDURES NEITHER AFFORD AN ADEQUATE CORRECTIVE PROCESS NOR COMPLY WITH DUE PROCESS AND EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT.
 ASSIGNMENT OF ERROR III CONSIDERED TOGETHER, THE CUMULATIVE ERRORS SET FORTH IN APPELLANT'S SUBSTANTIVE GROUNDS FOR RELIEF MERIT REVERSAL OR REMAND FOR A PROPER POST CONVICTION PROCESS.
In the first assignment of error, appellant claims that the trial court erred when it overruled appellant's post conviction petition since the petition presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.
Revised Code 2953.21 governs petitions for post conviction relief and states in relevant part as follows:
 (A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
* * *
 (C) The court shall consider a petition that is timely filed under division (A)(2) of this section even if a direct appeal of the judgment is pending. Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal.
In State v. Calhoun (1999), 86 Ohio St.3d 279, 282-283, the Ohio Supreme Court held:
 According to the post conviction relief statute, a criminal defendant seeking to challenge his conviction through a petition for post conviction relief is not automatically entitled to a hearing. State v. Cole
(1982), 2 Ohio St.3d 112, 2 OBR 661, 443 N.E.2d 169. Before granting an evidentiary hearing on the petition, the trial court shall determine whether there are substantive grounds for relief (R.C. 2953.21[C]), i.e., whether there are grounds to believe that `there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.' R.C. 2953.21(A)(1).
The court also went on to hold that it is not unreasonable to require the defendant to show in his petition for post conviction relief that the alleged errors resulted in prejudice before a hearing is scheduled.Calhoun, 86 Ohio St.3d at 283 (citing State v. Jackson (1980),64 Ohio St.2d 107, 112). Therefore, before a hearing is granted, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the merit of his claims. See Id.
The trial court must determine if a hearing is warranted based upon the petition, supporting affidavits, and all of the files and records pertaining to the proceedings. State v. Pierce (1998), 127 Ohio App.3d 578,586; State v. Smith (Dec. 11, 1997), Jefferson App. No. 96-JE-44, unreported. A trial court's decision regarding whether or not to conduct an evidentiary hearing in post conviction matters is governed by the "abuse of discretion" standard. Smith, supra (citing State ex rel.Richard v. Seidner [1996], 76 Ohio St.3d 149, 151). An abuse of discretion connotes conduct which is unreasonable, arbitrary, or unconscionable. See Richard, supra.
Appellant's post conviction petition claims, raised in assignment of error I, may be divided into three categories: (A) the death penalty is cruel and unusual punishment; (B) prosecutor committed misconduct in withholding evidence; and (C) counsel provided ineffective assistance.[4]
A. DEATH SENTENCE
In his ninth and tenth grounds for relief, appellant argued that the death penalty was unconstitutional under the United States and Ohio Constitutions because the methods used to carry out the sentence, electrocution or lethal injection, were cruel and unusual punishment and violated the due process protections. Appellant contended it inflicts "tortuous, gratuitous, and inhumane pain, suffering, anguish, and mutilation on the person executed." In support of his claims, appellant provided the affidavit of Michael L. Radelet, Ph.D. Sociology, which outlined instances of "botched" executions. The trial court found that neither the death penalty nor the means of execution were cruel or unusual.
The Ohio Supreme Court found Ohio's methods of execution pursuant to a sentence of death do not constitute cruel and unusual punishment. Statev. Carter (2000), 89 Ohio St.3d 593, 608. In Carter, the Ohio Supreme Court noted that it and the United States Supreme Court had previously held that execution by electrocution did not violate the United States and Ohio Constitutions. In re Kemmler (1890), 136 U.S. 436, 443-444,10 S.Ct. 930, 932, 34 L.Ed. 519, 522-523; State v. Coleman (1989),45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633. The Carter court further noted that while the United States Supreme Court had granted certiorari
to a case that involved the issue of whether execution by electrocution violated the Cruel and Unusual Punishment Clause, Bryan v. Moore (1999),528 U.S. 960, 120 S.Ct. 394, 145 L.Ed.2d 306, the United States Supreme Court subsequently dismissed it as improvidently granted after the Governor of Florida signed into law a bill allowing lethal injection as an option to the electric chair. Bryan v. Moore, supra.
The Carter court noted that Carter failed to cite any case in which lethal injection had been found to be cruel or unusual punishment. Therefore, the Ohio Supreme Court overruled Carter's argument. In the case sub judice, as in Carter, appellant has failed to cite to any case in which lethal injection was found to be cruel and unusual punishment. Pursuant to Carter, we find appellant's claim has no merit.
B. PROSECUTORIAL MISCONDUCT
In his twelfth and thirteenth grounds for relief, appellant argued that the prosecutor withheld evidence favorable to appellant and material to his guilt. Appellant contended that the State wrongfully withheld evidence that the State's key witness, Kesha Frye, the mother of the victim, had falsely accused a man of rape in the past. Appellant claimed that he could have used her false complaint to discredit her testimony against appellant. The trial court found that (1) Kesha Frye was not the State's primary witness, (2) it was not clear that the evidence would have been admissible impeachment evidence and (3) most importantly, the factual contention was not shown to be true.
While there may be issues as to whether the mother of the victim was the State's key witness or whether any such evidence could be used to impeach the witness, we need not address those issues. We agree with the trial court that appellant has failed to demonstrate that Kesha Frye's allegation of rape was a false claim. Appellant submitted evidence that showed that Frye made an allegation to police that she had been raped by a man, that the charges were designated as "exceptionally cleared" by the police and that the man was not prosecuted. Documentation submitted by appellant explained the term "exceptionally cleared" as follows: 1) the identity of the offender has been established; 2) there is enough evidence to support an arrest, charge, and turning over to the court for prosecution; 3) the location of the offender is known so that the offender may be taken into custody; and 4) there is some reason outside law enforcement's control that precludes arresting, charging, and prosecuting the offender. See Attachment to Affidavit of Joan Hayes, Paralegal, Office of Ohio Public Defender. Reasons precluding arrest, charges and prosecution may include the suicide or death of the offender, prosecution of the offender in another jurisdiction or a refusal on the part of the victim to cooperate. Id.
From the evidence presented by appellant, we cannot agree with appellant that Frye had made a false allegation of rape. There has been no showing that Frye lied or the allegation was false. Therefore, we find appellant's claims meritless.
C. INEFFECTIVE ASSISTANCE OF COUNSEL
Appellant contends that his trial counsel were ineffective for nine reasons:[5]
 They failed to investigate and present evidence regarding appellant's serotonin level and its effect on appellant; (First Ground for Relief)
 They conceded too many facts in closing argument without appellant's permission; (Second Ground for Relief).
 They failed to meet a standard of effectiveness; (Third Ground for Relief)
 4. They failed to voir dire the jury sufficiently about pretrial television coverage; (Fourth Ground for Relief)
 5. They failed to voir dire the jury sufficiently about pretrial newspaper coverage; (Fifth Ground for Relief)
 6. They failed to move for a change of venue; (Sixth Ground for Relief)
 7. One of appellant's trial counsel, Attorney Whitney, represented the victim's mother's grandfather's nephew in another criminal case during the same period in which he represented appellant; (Seventh Ground for Relief).
 8. They failed to tell appellant that he had the right to testify at his own trial. (Eighth Ground for Relief)
The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989), 42 Ohio St.3d 136. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential.Id. at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
This court shall address each of the claims in light of our standard of review.
 1. Failure to investigate and present serotonin evidence
In his first ground for relief, appellant claimed he was denied effective assistance of counsel when his counsel failed to investigate and present exculpatory and mitigating evidence concerning the possibility that appellant suffered from low serotonin levels. Appellant contends that low serotonin levels could have contributed to appellant's alleged violent behavior. However, we find that appellant has failed to prove that he was prejudiced by his trial counsels' failure to investigate and present the possibility that appellant suffered from low serotonin level. To do so would require that appellant show that there was evidence counsel failed to present and that there is a reasonable probability that the evidence would have convinced the jury to impose a life sentence or find appellant not guilty.
In the case sub judice, appellant presented the affidavit of molecular neurobiologist S. Paul Rossby, Ph. D. Dr. Rossby has studied the neurobiology of depression, impulsive behaviors, post-traumatic stress disorders, and suicide at the molecular and systems levels in the brain, with special emphasis on the "serotonin connection," for nine years. See Affidavit of S. Paul Rossby. Appellant sought to use Dr. Rossby's affidavit to establish that his trial counsel were ineffective when they failed to present exculpatory and mitigating evidence regarding the effects of low serotonin levels. Appellant asserted that had trial counsel investigated available psychological and physiological research regarding reasons for violent behavior and the lack of ability to control such violence, they would have learned of the adverse effects of low serotonin and requested that appellant be tested to determine if appellant suffered from the condition.
Upon review of the Dr. Rossby's affidavit, we find that it does not sufficiently establish that appellant's trial counsel were ineffective so as to warrant a hearing on the claim. First, appellant has failed to establish that he suffers from a low serotonin level or any other biological problem to which Dr. Rossby refers in his affidavit. However, even were we to assume that appellant suffers from a low serotonin level, Dr. Rossby's affidavit fails to sufficiently demonstrate that the current state of medical research is established to the point at which a failure to present such evidence to a jury would or could fall below an objective standard of representation or constitute a prejudice to appellant. Dr. Rossby's affidavit is filled with indications that the "science" referred to has not been established or necessarily understood. In fact, the affidavit demonstrates that the scientific assertion is highly speculative. For example:
 "There is a type of violence that involves a sudden and complete loss of control. It apparently results from emotional "triggers" and the failure of chemical/electrical systems in the brain that enable us to control our impulses . . . The research consistently demonstrated that most men whose violent crimes were impulsive (based upon police records) had significantly lower serotonin activity in their brains than men who premeditated their violent crimes. . . . Serotonin is an inhibitory chemical in the brain. Furthermore, there is considerable scientific evidence indicating that serotonin "orchestrates" the other inhibitory systems in the brain — including those that control anxiety, fear and pain. The relationship between low serotonin activity and type-2 alcoholism is not completely understood. However, there is strong evidence that the first few drinks release stored serotonin in the brain thus producing a transient feeling of euphoria. However soon after the serotonin is released it is degraded (metabolized). This results in a further reduction of serotonin activity and a sudden switch from relative euphoria to irritability, anger and a general loss of impulse control. . . . Living with abnormally low serotonin activity in the brain is like driving a car with bad brakes. When thoughts and emotional "triggers" cause the release of excitatory neuro-transmitters (accelerators) the inhibitory systems (the brakes) may fail. . . . [L]ow serotonin activity in the brain does not produce violent behavior; it apparently reduces or in many cases
virtually eliminates one's biological capacity to control the impulsive violence once it has been triggered.
Affidavit of Dr. S. Paul Rossby (Emphasis added.)
We find the state of research, as set forth in Dr. Rossby's affidavit, into the effects of low serotonin activity is too speculative at this point to say that failure to investigate the possibility that appellant suffers from such a problem or failure to present such evidence was ineffective assistance of counsel. Further, we cannot say that appellant was prejudiced. Even if appellant had been tested for low serotonin levels and found to suffer from the problem, we cannot say that there is a reasonable probability it would of have swayed the jury to find appellant not guilty or give a life sentence. Dr. Rossby's affidavit does not sufficiently establish that a low serotonin level would have caused appellant to commit the crime in question or contributed to appellant's actions in anyway. Dr. Rossby stated that low serotonin activity doesnot produce violent behavior. It also appears, from the affidavit, that persons who suffer from these conditions can control their impulses at most times. Further, even if we were to accept that at times appellant could not control impulses due to low serotonin levels, Dr. Rossby has not said, nor do we believe can he say, with any degree of certainty that appellant could not have controlled his impulse in this case. Dr. Rossby has presented no evidence as to how a jury could distinguish between a action that appellant could not control versus an impulse that appellant could have resisted but chose not to. In conclusion, we find appellant's claim and the science upon which it is based highly speculative. We find trial counsel's actions did not fall below an objective standard and appellant failed to show prejudice.[6]
 2. Concession of facts in closing argument without appellant's knowledge or permission
Appellant claimed that trial counsel told the jury, in effect, that appellant was guilty. Appellant claimed that trial counsel's concession of guilt breached his duty to appellant. Appellant claimed that he never intended to plead guilty and did not give counsel permission to concede guilt.
Appellant's claim was based upon the following comments made by defense counsel during closing arguments:
 The State of Ohio in this case must prove to you individually and as a body of twelve beyond a reasonable doubt Steve Smith's state of mind on the evening of September the 28th of 1998 and early morning of September the 29th of 1998. The issue in this case is did Steve Smith purposely cause the death of Autumn Carter. The evidence is abundant, Steve Smith, the physical being of Steve Smith did horrible things on the late hours of September 28th and/or in the early morning hours or a combination of both of September 29th, 1998 in Apartment C out here on Harwood Drive. The question is where was the emotional being of Steve Smith when these events transpired. Where was the mental being of Steve Smith at this time?
Transcript of Proceedings, 2129 In support of his assertions, appellant presented an affidavit which stated that he "never agreed to plead guilty or to concede any facts. My attorneys never discussed this with me." Affidavit of Steven T. Smith.
Counsel are required to consult with a client on important trial decisions. State v. Smith (1985), 17 Ohio St.3d 98, 101. However, in reviewing claims of ineffective assistance of counsel, appellate courts are admonished to be highly deferential, indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and refrain from second guessing strategic decisions of trial counsel. State v. Carter (1995), 72 Ohio St.3d 545,558, 651 N.E.2d 965; State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373. This last point is particularly significant as trial tactics are generally not subject to question by a reviewing court.State v. Fryling (1992), 85 Ohio App.3d 557, 562, 620 N.E.2d 862. Statev. Hull (Dec. 3, 1999), Lucas App. No. L-98-1307, unreported.
The decisions made regarding closing argument by trial counsel in the case sub judice were legitimate trial tactics. See State v. Hull, supra. We agree with the trial court that trial counsel's statement was not an admission of guilt and may have been made as part of a trial strategy to allow counsel to maintain credibility in the face of the evidence presented and focus the argument on what was arguably appellant's best defense — mental intent. While counsel were required to consult with their client on important trial decisions, appellant has failed to demonstrate he was prejudiced.
 3. Expert witness claims that trial counsel failed to meet the standard of effectiveness
In the third ground for relief, appellant argued that he was denied the effective assistance of counsel and provided an affidavit of another attorney in support. The affidavit outlined instances where it was asserted that defense counsel was ineffective and provided an expert opinion that trial counsel were ineffective. The trial court held that whether defense counsel were ineffective was not an issue to be resolved by expert opinion. The trial court noted, as do we, that appellant presented no authority that attorney expert opinion is even admissible on the question of ineffective assistance of counsel. The trial court concluded that the affidavit was an attempt to present the trial court with an amicus curiae brief without permission of the trial court.
We are cognizant that there is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. Strickland v. Washington (1984), 466 U.S. 668, 689. We cannot say that the trial court abused its discretion in failing to order a hearing or permit discovery based upon the affidavit of another attorney which, in effect, amounts to a second guessing of the trial tactics employed by defense counsel. Carter, 72 Ohio St.3d at 558; Bradley,42 Ohio St.3d at 142 (appellate courts are admonished to refrain from second guessing strategic decisions). We find appellant's claim meritless.
4 5. Voir Dire on Pretrial Publicity
In the fourth and fifth grounds for relief, appellant claimed that his trial counsel were ineffective in questioning jurors about pretrial publicity. In support, appellant provided videotape footage from a local TV station, what appears to be a transcript or text from a teleprompter, and copies of articles from local newspapers. In denying appellant's post conviction claim, the trial court found that the issue of pretrial publicity was adequately addressed during voir dire. We agree.
Voir dire, whether conducted by the court or by counsel, is sufficient if it reveals that the jurors will be able to set aside any impression they formed on the basis of pretrial publicity and decide the case solely on the law and the evidence presented at trial. See Mu'Min v. Virginia
(1991), 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493; State v. Spirko
(1991), 59 Ohio St.3d 1, 24. In this case, the voir dire was extensive. See Transcript of Proceedings, Vol. IV V, pages 190-838. Upon a review of the record, in light of the evidence of the extent and type of press coverage of the case as presented by appellant, we find that the voir dire identified the extent of exposure to pretrial publicity of each seated juror and revealed that each seated juror stated that they could set aside any impression, if any, they may have formed in response to the media coverage.[7]
We agree with the trial court that the issue of pretrial publicity was adequately addressed in voir dire and appellant was not prejudiced by counsels' actions or omissions in conducting the voir dire in regards to pretrial publicity.
We note that appellant cites this court to only one portion of the transcript which he argues supports his claim: "One potential juror, Mr. Workman stated in front of the entire jury panel that he could not believe in petitioner's innocence after what he had read in the newspaper the previous day." Appellant's Merit Brief. However, this is not an accurate reflection of the record. The record demonstrates the following exchange with Mr. Workman took place in front of the jury pool:
 MR. WHITNEY: Well, you understand that you have to start this case as a juror believing, believing, because that's the law, that Steve Smith is innocent. Can you do that?
 MR. WORKMAN: Well, from what I've read in the paper yesterday —
 THE COURT: Well, wait a minute. I don't want to hear about what you read in the paper. We're going to talk about that later, but the principle here is you must presume he's innocent unless he's proven guilty. If you're not going to make the time for them to produce proof to prove him guilty it's not fair for you to be a juror in this case. Accusations don't count for anything. Only proof counts. If proof is not produced here you may not convict him. That's the principle of law that's at issue here. We're going to talk more later about what's been read in the paper and so forth. Why don't you come up here, and we can talk easier up here.
 THEREUPON, the following proceedings took place at the bench, outside the hearing of the prospective jurors:
 THE COURT: It's really not fair for me to departmentalize this to such a great extent. You're saying based on things you've already read in the paper you already have an opinion on his guilt?
MR. WORKMAN: In my opinion, yes. . . .
 THE COURT: We appreciate your honesty about your feelings. We'll excuse you, Mr. Workman. Thank you. You're excused as a juror.
Transcript of Proceedings, 349-353.
The record clearly shows that discussions regarding the newspaper coverage and their effect on Mr. Workman were conducted outside of the jury's hearing, at the bench and not before the jury pool. Further, Mr. Workman was excused as a potential juror and did not sit as a juror on the case. Therefore, we find appellant has failed to present operative facts demonstrating prejudice to appellant.
Additionally, this claim could have been raised at trial or on direct appeal. If a court finds that an issue could have or was raised on direct appeal, the court may dismiss the claim on the grounds of preclusion, i.e. as res judicata. State v. Milanovitch (1975), 42 Ohio St.2d 46;State v. Ball (July 10, 1998), Cuyahoga App. No. 73193, unreported. Therefore, this claim is barred by the doctrine of res judicata.
6. Change of Venue
In his sixth ground for relief, appellant asserted that the pretrial publicity was prejudicial and that appellant's trial counsel were ineffective for failing to move for a change of venue. The trial court rejected appellant's claim and denied a hearing on the issue on the grounds that the voir dire demonstrated that an impartial jury could be impaneled.
It has long been the rule in Ohio that in considering whether a change of venue is warranted, "[t]he examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community against the defendant, and [whether] it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence." State v. Swiger (1966),5 Ohio St.2d 151, paragraph one of the syllabus; State v. Maurer (1984),15 Ohio St.3d 239, 251 (citing State v. Bayless (1976), 48 Ohio St.2d 73,98, vacated in part on other grounds (1978), 438 U.S. 911. "[w]here the record on voir dire establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and evidence presented at trial, it is not error to empanel such veniremen." Maurer, 15 Ohio St.3d at 252.
First, while the evidence dehors the record offered by appellant in this case provides more detail regarding the content of the media coverage, it does not show that he was prejudiced from having a fair trial. Second, the trial record shows that each potential juror was asked about previous knowledge and impressions of the case that they may have formed from media reports, both from broadcasts and from reports in print. While some jurors indicated that they had seen or read news accounts, all of the jurors seated indicated that, if they had been exposed to pretrial media coverage, they could set aside all that they learned and could base their verdict solely on the evidence heard at trial. Therefore, appellant has failed to show that a change of venue was warranted or that he was prejudiced by the failure to attempt to obtain a change of venue. Third, this claim could have been raised at trial and/or on direct appeal. Therefore, this claim precluded as res judicata. SeeState v. Milanovitch, 42 Ohio St.2d 46.
7. Representation of relative of victim
Appellant asserted he was denied effective assistance of counsel because one of appellant's trial counsel represented a relative of the victim, Matthew Frye, at the same time that he represented appellant. Appellant asserted that his Sixth Amendment rights were violated because this attorney had a conflict of interest which resulted in divided loyalties between the attorney's clients.
When a party does not raise a conflict of interest issue at trial, even if the party was not aware of the conflict, the party must demonstrate an actual conflict of interest adversely affected defense counsel's performance. State v. Boyle (Oct. 6, 2000), Richland App. No. 00-CA-34, unreported ; State v. Russell (Aug. 5, 1994), Washington App. No. 94 CA 1, unreported. Appellant presented evidence that one of appellant's trial counsel, Robert Whitney, represented Mathew Frye at the same time as appellant. An affidavit of an investigator with the Office of the Ohio Public Defender's Office showed that Matthew Frye claimed that his Uncle was the victim's great grandfather.[8]
First, appellant has not shown an actual conflict of interest existed. Appellant has presented no evidence that there was a close relationship between Mr. Frye and the victim so as to create a real conflict of interest and the family relationship is not direct. Furthermore, even if we were to decide that a conflict of interest of constitutional proportions did exist, which we do not find, appellant has failed to argue or show how any act or omission of appellant's counsel at trial resulted in prejudice to appellant.
8. Right to Testify
In his eighth claim for relief, appellant claims that his trial counsel were ineffective because they failed to discuss with appellant that he had a right to testify during the culpability phase of his trial. Appellant's appellate counsel argued that he was prejudiced because "he was unable to tell the jury that he did not do this heinous crime." Appellant's Post conviction Petition. In support, appellant presented an affidavit in which he stated "[m]y attorneys also never told me that I had a right to testify during the trial phase."
First, we note that appellant has not claimed in his sworn statement that he was unaware of his right to testify[9], that he wished to testify or that his testimony would have been that he did not commit the crime[10]. Based upon the evidence presented by appellant, we cannot find that appellant has made a sufficient showing that he was prejudiced by his failure to testify.
Conclusion
Based on the foregoing, this court finds that appellant has failed to sufficiently demonstrate that trial counsels' representation fell below an objective standard of reasonableness or that there was a reasonable probability that, but for the alleged errors, the result of the proceeding would have been different.
D. DISCOVERY
Appellant alleges that he presented sufficient operative facts to merit the use of discovery procedures. While the proceedings are civil in nature, the Civil Rules concerning discovery are not applicable. Statev. Smith (1986), 30 Ohio App.3d 138, 140; State v. Sherman (Oct. 30, 2000), Licking App. No. 00CA39, unreported. The procedure to be followed in ruling on a petition for post conviction relief is established by R.C. 2953.21. The power to conduct and compel discovery is not included within the trial court's statutorily defined authority. See State exrel. Love v. Cuyahoga County Prosecutor (1999), 87 Ohio St.3d 158, 159
(citing State v. Spirko (1998), 127 Ohio App.3d 421, 429). Because the pivotal issue is whether there is substantial grounds for relief which would warrant a hearing based upon the petition, the supporting affidavits and the files and records of the case, the statute does not contemplate discovery in determining whether a hearing is warranted. Id. Therefore, we find that the trial court did not error in denying appellant discovery.[11]
In conclusion, we agree with the trial court that appellant failed to present sufficient, operative facts to warrant the granting of a hearing and discovery on appellant's Petition for Post conviction Relief. Therefore, we find that the trial court did not abuse its discretion when it denied appellant's Petition without a hearing or grant of discovery.
Appellant's first assignment of error is overruled.
 II
In the second assignment of error, appellant contends that Ohio's post conviction procedures do not afford an adequate corrective process nor comply with due process or equal protection. Appellant contends that the procedures are deficient because they do not permit the use of discovery to obtain support for a post conviction petition. We disagree.
First, we note that appellant failed to raise the issue of the constitutionality of R.C. 2953.21 during the trial court proceedings. Generally, an appellate court will not consider an issue regarding the constitutionality of a statute when the issue was not raised in the trial court. State v. Awan (1986), 22 Ohio St.3d 120, syllabus ("Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue. . . ."). "`However, because of the . . . exacting review necessary where the death penalty is involved, [courts may] reserve the right to consider the constitutional challenges in particular cases.'" State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported (quoting State v. Zuern (1987), 32 Ohio St.3d 56,63). Therefore, we will briefly address appellant's contention.
This issue has been considered by the First, Third, Fourth, and Twelfth District Courts of Appeal. These Courts have found that failure to afford discovery during the initial proceeding to determine whether a hearing is warranted does not render the post conviction process unconstitutional.State v. Yarbrough (April 30, 2001), Shelby App. No. 17-2000-10, unreported; State v. La Mar (March 17, 2000), Lawrence App. No. 98CA23, unreported; State v. Goff (March 5, 2001), Clinton App. No. CA2000-05-14, unreported; State v. Campbell (Jan. 8, 1997), Hamilton App. No. C-950746, unreported; State v. Johnson (Dec. 1, 2000), Hamilton App. No. C-000090, unreported. We agree.
Statutes enjoy a strong presumption of constitutionality. State v.Cook (1998), 83 Ohio St.3d 404, 409. In order for a court to declare a statute unconstitutional, "it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible."Id. at 409 (citing State ex rel. Dickman v. Defenbacher (1955),164 Ohio St. 142, paragraph one of the syllabus). All doubts regarding the validity of a statute are to be resolved in favor of the statute.State v. Gill (1992), 63 Ohio St.3d 53, 55. The party seeking to declare a statute unconstitutional bears the burden of proving beyond a reasonable doubt that the statute and a constitutional provision are incompatible. State v. Warner (1990), 55 Ohio St.3d 31.
The right to file a petition for post conviction relief is a statutory right, not a constitutional right. State v. La Mar, supra. This is so even in capital cases. State v. Steffen (1994), 70 Ohio St.3d 399. The Ohio Supreme Court has stated: "State collateral review is not itself a constitutional right. . . . Further, a post conviction proceeding is not an appeal of a criminal conviction but, rather, a collateral civil attack on the judgment. . . . Therefore, a petitioner receives no more rights than those granted by the statute." State v. Calhoun (1999),86 Ohio St.3d 279, 281. As noted in the previous assignment of error, the statute does not grant the right to discovery. We agree with the other appellate courts that have looked at this issue and find that the lack of discovery does not violate any constitutional rights of the petitioner. See State v. La Mar, supra.
 III
In the third assignment of error, appellant argues that the cumulative errors, when considered together, as set forth in the above considered grounds for relief, merit a reversal or remand.[12] We disagree.
Under the doctrine of cumulative error, ". . . a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." State v. Garner (1995), 74 Ohio St.3d 49, 64. The doctrine only applies in cases of multiple instances of harmless error.Id. Because the present case was not replete with multiple instances of harmless error, the doctrine does not apply and does not constitute grounds for a reversal or remand.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas is affirmed. Costs to appellant.
Edwards, P.J. Gwin, J. and Boggins, concur.
[1] Appellant is not the father of Autumn or Ashley.
[2] Case No. 99-905.
[3] Although it appears the trial court denied appellant leave to file an amendment to the Petition, the trial court, in its Decision, addressed the claims raised in the September 1, 2000, First Amendment.
[4] Appellant raised a claim (eleventh ground for relief) that cumulative errors merit a reversal or remand. This claim is considered in the third assignment of error.
[5] Appellant was represented by attorneys Robert H. Whitney and Bernard R. Davis.
[6] We further note that appellant's claim that a low serotonin level may have inhibited his ability to refrain from acting on an impulse is in the nature of an affirmative defense. Such a claim infers that the offender committed the act but should be exempt from liability. See Statev. Powell (Sept. 29, 1997), Ross App. No. 96CA2257, unreported (citingState V. Poole (1973), 33 Ohio St.2d 18 19; State v. Roy (Mar. 27, 1996), Adams App. No. 95CA590). Here, appellant has not admitted to the actions of which he was accused and convicted. Appellant has presented no operative facts or evidence that he suffered from the lack of ability to control his impulses regarding Autumn. Further, while appellant's statement to the police indicated that he had no recall of the time shortly before it was discovered that the child was terminally injured, Dr. Rossby's affidavit does not identify such a "black out" as a symptom or indicator of violent behavior induced by low serotonin levels.
[7] Initially, the subject of pretrial publicity was addressed to some extent by the trial court in a group setting, followed by a more detailed voir dire by the trial court, with the State and appellant's counsel given the opportunity for follow-up questions, with each individual prospective juror, outside of the presence of other prospective jurors. Any juror who felt they were influenced by the media coverage was removed from the jury pool.
[8] The affidavit states that Matthew Frye claims that "his uncle is Keysha's [sic] [the mother of the victim] grandfather."
[9] We note that this was not appellant's first experience with the criminal justice system. Appellant had a prior criminal record.
[10] In a statement given to police by appellant, appellant claimed that he did not have any recollection of events from 11:15 P.M. on September 28, 1998, when he fell asleep, until 3:25 A.M. on September 29, 1998, when he woke up and found the injured and dying baby in her swing. Transcript of Proceedings, 1816-1817.
[11] We note that appellant would seem to agree with our conclusion because in assignment of error II, appellant's argument includes a statement that "[i]f a defendant files a post conviction petition under R.C. 2953.21, the petition must set forth grounds for relief and must support each claim with evidence dehors the record — all without the benefit of the discovery processes available to every other civil litigant."
[12] This assignment of error is based upon the eleventh ground for relief as raised in appellant's Petition for Post conviction Relief.