[Cite as *State v. Howell*, 2012-Ohio-4349.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| V. | ) | CASE NO. 10-MA-148 |
| | ) | |
| HESTER HOWELL, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from Court of Common
Pleas of Mahoning County, Ohio
Case No. 08CR869

JUDGMENT:                                    Affirmed

APPEARANCES:
For Plaintiff-Appellee                    Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant               Atty. Jeffrey A. Kurz
42 N. Phelps St.
Youngstown, Ohio 44503-1130

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: September 21, 2012

DONOFRIO, J.

{¶1} Defendant-appellant, Hester Howell, appeals from a Mahoning County Common Pleas Court judgment convicting him of assault and kidnapping, with an accompanying firearm specification, following a jury trial.

{¶2} In the evening hours of July 7, 2008, Edna Davis was at a barbeque on the south side of Youngstown with appellant. Davis and appellant had been involved with each other for approximately seven weeks. The two left the barbeque together and walked to a house at 1823 Glenwood Avenue. The house was owned by Debbie Garner but she did not live there. Garner had hired appellant to do some maintenance work at the house. Apparently, appellant stayed at the house on occasion.

{¶3} Davis and appellant argued on the way to the house. Upon arriving at the house, appellant became abusive toward Davis.

{¶4} According to Davis, she attempted to leave but appellant threatened her life. Davis stated that appellant pushed and hit her. She stated that he punched her in the face, neck, and head. One blow landed on her nose, which began gushing blood when she pushed it back into place. Appellant ordered Davis to remove her clothes and to use her clothes to clean up the blood that was on the floor. Davis complied. Davis further stated that appellant threatened her with a gun that he fired twice. He then dropped the hot gun in her lap causing burns on her inner thighs. Davis stated that appellant also threatened her with a machete.

{¶5} After approximately three to four hours, Davis, still naked, was able to run out of the house. She ran down Glenwood Avenue and jumped into a car that was driving on Glenwood. The two girls in the car called 911 and drove Davis to Big A's convenience store where they waited for the police to arrive.

{¶6} A Mahoning County Grand Jury subsequently indicted appellant on one count of kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(3)(C); one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(2)(D); one count of attempted murder, a first-degree felony in violation of R.C. 2923.02(A) and R.C. 2903.02(A)(D); one count of domestic violence, a third-

degree felony in violation of R.C. 2919.25(A)(D); and one count of having weapons while under disability, a third-degree felony in violation of R.C. 2923.13(A)(2)(B). The charges also carried firearm specifications. The charges were bifurcated so that the having weapons under disability charge was not part of appellant's jury trial.

{¶7} The matter proceeded to a jury trial. On appellant's motion, the trial court dismissed the domestic violence count. The jury found appellant not guilty of attempted murder. The jury found appellant not guilty of felonious assault, but found him guilty of the lesser included offense of assault. It also found him guilty of kidnapping and of the accompanying firearm specification.

{¶8} Appellant later entered a no contest plea to the charge of having weapons while under disability and the court found him guilty on this charge.

{¶9} The matter proceeded to sentencing where the court sentenced appellant to a total of seven years in prison.

{¶10} Appellant filed a timely notice of appeal on September 9, 2010.

{¶11} Appellant raises four assignments of error, the first of which states:

THE PROSECUTION FAILED TO PROVIDE CRIM.R. 16 MATERIALS, FAILED TO PROVIDE A WITNESS LIST, VIOLATED BRADY V. MARYLAND, DENIGRATED OPPOSING COUNSEL AND MADE INAPPROPRIATE STATEMENTS REGARDING INADMISSIBLE EVIDENCE AND THE CREDIBILITY OF WITNESSES.

{¶12} Appellant breaks this assignment of error down into three separate issues.

{¶13} First, appellant argues that the state failed to provide his counsel with a witness list and a copy of Davis's complaint. He claims that his counsel objected to the witness's testimony on this basis. (Tr. 555). He contends this deprived his counsel of the opportunity to prepare for trial. He further contends that the court should have sanctioned the prosecutor for the failure to adhere to Crim.R. 16 and

Loc.R. 9(B)(5).

**{¶14}** Crim.R. 16(B) provides that, upon the defendant's written demand for discovery, the prosecution has a duty to disclose evidence that is material to the preparation of a defense, is intended for use by the prosecutor as evidence at the trial, or was obtained from or belongs to the defendant, within the possession of, or reasonably available to the state.  And Loc.R. 9(B)(5) provides that the prosecutor shall provide defense counsel with an information packet that contains the names and address of all witnesses.

**{¶15}** A violation of Crim.R. 16 by the state is reversible only when there is a showing that "(1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995).

**{¶16}** Here, appellant contends that the state failed to provide him with Debbie Garner's name and address.  Appellant objected at trial to Garner's testimony arguing that he never received a witness list with her name on it.  (Tr. 554).  But the prosecutor provided a "case cover sheet" to the court dated July 15, 2008, documenting that the state provided defense counsel with Garner's name, telephone number, and a synopsis of what her testimony would be.  (Tr. 558).

**{¶17}** And as to the state's failure to provide defense counsel with a copy of Davis's complaint, appellant failed to object in the trial court.  The failure to object to an alleged error waives review of all but plain error.  *State v. Krupa*, 7th Dist. No. 09-MA-135, 2010-Ohio-6268, ¶57.  To prevail on a claim governed by the plain error standard, an appellant must demonstrate that the trial outcome would have been clearly different but for the alleged error. *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996).

**{¶18}** Appellant has not alleged how he suffered prejudice here or how the outcome of his trial would have been different.  Moreover, the police interviewed Davis the day after the incident.  (State Ex. 6).  Appellant has not asserted that the

state failed to provide him with the DVD of Davis's interview. Thus, we can presume that defense counsel had access to the DVD of Davis's interview, which provided her account of the events.

{¶19} Second, appellant argues that the prosecutor committed misconduct by asking Davis improper questions and making improper comments during closing arguments.

{¶20} Appellant takes issue with several questions/comments by the prosecutor. He claims it was error for the prosecutor to ask Davis if she felt that the defense attorney twisted her words and upset her. (Tr. 600). And he claims it was error to ask Davis if she thought appellant would have ever let her go. (Tr. 618).

{¶21} Additionally, appellant takes issue with several closing argument comments. Specifically, he takes issue with the prosecutor's comments that:

> Well, he [the defense attorney] cross examined her [Davis] before. They [Davis and the defense attorney] actually knew each other, and she felt the same way the last time he cross examined her; that he twists her words; that he tries to take them out of context. That's his job. He's a defense attorney. He is defending his client.
>
> * * *
>
> He [defense attorney] wants to talk about the barbeque, the catering, the time. But if I were him, I can't blame him. I would want to talk about those things, too, because I wouldn't want to talk about the evidence that shows the defendant is guilty. I wouldn't want to talk about that if I were sitting next to Hester Howell. Because there is substantial evidence that the defendant is guilty.
>
> He wants to tell you that, well, why, why would you want to believe Edna Davis? She's a liar. She is lying. Not one person said that she had a reputation or that it was their opinion that she is a dishonest person. He certainly had the right to ask that. But not one person said that because she is not a dishonest person. She has no

reason to lie.

(Tr. 928-931).

**{¶22}** Appellant argues that the prosecutor's statement concerning the lack of any witness to suggest that Davis was lying was an attempt to imply that appellant had something to hide by not taking the witness stand in his own defense. He contends that the remainder of the above cited comments by the prosecutor deprived him of a fair trial.

**{¶23}** The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected the appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121.

**{¶24}** Appellant failed to object to the above cited comments and questions. Thus, we will review this argument for plain error.

**{¶25}** The comments and questions appellant takes issue with do not seem to have been improper. In fact, appellant does not assert how they may have been improper. Instead, he merely asserts that they deprived him of a fair trial. The gist of the majority of the comments/questions was meant to argue that Davis was being truthful in her testimony. And one comment was simply that appellant was focusing on inconsequential details in order to avoid the issue of whether he was guilty. There was no plain error in regard to these questions/comments.

**{¶26}** Appellant also takes issue with a comment by the prosecutor that, "If

her [Davis's] statements were not reliable in the eyes of the court, you would not have received them." (Tr. 934). But appellant's counsel objected to this statement and the trial court sustained the objection, noting that it "would handle the law." (Tr. 934). Thus, there was no error here.

{¶27} Third, appellant argues that the police violated the holding in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Appellant contends that the police in this case intentionally failed to collect and preserve material evidence. Specifically, he asserts that Officers Robert DiMaiolo, Jerry Fulmer, and Phillip Chance should have taken the names, addresses, and phone numbers or the statements of the two women whose car Davis jumped into. He further asserts the investigating officers should have visited the house where the barbeque took place and recorded the names that Davis gave them of the people in attendance. Moreover, appellant contends that the police should have tested Davis's hands for gunshot residue. Next, appellant asserts the police should have taken fingerprint evidence from the gun and the machete. Finally, he contends that the police removed the gun from the house and then returned it.

{¶28} These alleged "failures" on the part of the police were explored by counsel.

{¶29} Officer Chance testified that upon arriving at Big A's, he talked to the girls whose car Davis jumped into. (Tr. 711). He determined that they were at a stop sign and Davis got into their car. (Tr. 711). Officer Chance stated the girls called 911 and waited for the police to arrive. (Tr. 711). He determined that was the extent of their involvement. (Tr. 711).

{¶30} Lieutenant John Kelty testified that the police did not attempt to take fingerprints from the gun for several reasons. (Tr. 751). He stated that it is very difficult to get fingerprints from a firearm due to things such as heat, dampness, and

the contour of the weapon. (Tr. 751). Lt. Kelty stated that in his 20 years of police work, he knew of no case where a successful fingerprint was lifted from a firearm. (Tr. 752).

{¶31} Lt. Kelty also testified that he did not talk to anyone who had attended the barbeque. (Tr. 802). He did not think that it was relevant. (Tr. 803). He stated that he was solely concerned with what happened at 1823 Glenwood Avenue because that is where the crime was committed. (Tr. 803, 823-824).

{¶32} It was reasonable for the police to determine what aspects of their investigation required further inquiry and what aspects did not. And defense counsel cross examined the officers on these issues, thus calling their attention to the jury.

{¶33} As to the gun being removed and returned, Officer Chance stated that he removed the gun after the SWAT teamed checked the house. (Tr. 713). He took the gun to the police department and logged it in. (Tr. 722). Lt. Kelty, however, testified that when a weapon is found at a crime scene it is generally left where it is found until the crime lab can photograph it. (Tr. 785). He stated that is what he believed happened in this case. (Tr. 785). Photographs were admitted that showed the gun lying on floor. (State Exs. 12, 13, 14, 15; Def. Ex. 3). The photographs have the date of July 8, 2008, on them. But they do not contain the time that they were taken.

{¶34} It is interesting to note that all of the other photographs taken of and at the house have the photographer listed as Officer R. Mauldin. (State Exs. 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36; Def. Ex. 12). State's Exhibits 12 through 15, depicting the gun lying on the floor in the house, do not bear the photographer's name. But Defendant's Exhibit 3, also depicting the gun lying on the floor, does. The photographer is listed as Detective-Sergeant Dellick. This is significant because Detective-Sergeant Dellick was present for the SWAT team raid on the house. (Tr. 687). Officer Robert Mauldin, however, was a crime lab officer. (Tr. 745-746). Given the fact that the photograph of the gun was taken by a detective who was present for the raid and the other photographs were taken by a crime lab officer, it is reasonable

to draw the inference that Detective-Sergeant Dellick photographed the gun during the raid, before Officer Chance removed it.

**{¶35}** We will not assume, based on appellant's allegations, that the police removed the gun from the house and then later "staged" the gun in the house in order to photograph it.

**{¶36}** Overall, there is no indication that the prosecution suppressed evidence that was favorable to appellant as he asserts.

**{¶37}** Accordingly, appellant's first assignment of error is without merit.

**{¶38}** Appellant's second assignment of error states:

THE MANIFEST WEIGHT OF THE EVIDENCE SUPPORTED ACQUITTAL.

**{¶39}** Here appellant contends that the jury's guilty verdict was against the manifest weight of the evidence.

**{¶40}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 668 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶41}** Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the

facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶42} The jury convicted appellant of assault and kidnapping, with a firearm specification.

{¶43} The assault statute provides in pertinent part, "No person shall knowingly cause or attempt to cause physical harm."

{¶44} The kidnapping statute provides in pertinent part that no person, by force, threat, or deception shall restrain the liberty of another person, in order to terrorize, or to inflict serious physical harm on the victim. R.C. 2905.01(A)(3).

{¶45} The applicable firearm specification applies when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).

{¶46} We must consider the evidence as applied to the above offenses.

{¶47} Davis testified to the following. At the time of the incident, she and appellant had been involved with each other for approximately seven weeks. (Tr. 329). That day, Davis stated that she went to a barbeque and appellant met her there. (Tr. 334). The two left the barbeque together and walked to the house on Glenwood where appellant was staying. (Tr. 335, 337). They argued on the way to the house. (Tr. 338).

{¶48} Once they arrived at the house, appellant would not allow Davis to leave. (Tr. 339). He blocked the door and pushed her. (Tr. 340). Davis tried to fight

back by grabbing and scratching appellant. (Tr. 339-340). Appellant then repeatedly punched Davis in the face and neck. (Tr. 340-341). Davis began to cry and told appellant she wanted to go home. (Tr. 342). One of the punches broke her nose, which began gushing blood. (Tr. 343). Appellant next ordered Davis to remove her clothes and to clean up the blood with her clothes. (Tr. 344, 349-350). Davis complied. During this time, appellant threatened to shoot and kill Davis. (Tr. 344-345). Appellant had a gun that he was "playing with" and pointing at Davis. (Tr. 345). In addition to the gun, appellant threatened Davis with a machete and a miniature baseball bat. (Tr. 351).

{¶49} On a couple of occasions, appellant dropped the gun into Davis's lap. (Tr. 352). She stood up and let it drop to the floor. (Tr. 352-353). On one of the occasions the gun was hot from appellant just firing it and it burned the inside of Davis's thighs. (Tr. 353-354).

{¶50} While she was cleaning up the blood, Davis spit blood closer to the door in order to make a trail so that she would end up next to the door. (Tr. 350). She also unlocked the locks on the door. (Tr. 356-357). This was her escape plan. (Tr. 350).

{¶51} When she finally got the locks unlocked and was near the door, Davis ran out of the house, still completely naked. (Tr. 357-358). She ran down Glenwood and jumped into a car that was on the street. (Tr. 358-359). The two girls who were in the car drove Davis to Big A's convenience store and called the police. (Tr. 361).

{¶52} On cross examination, Davis was somewhat uncooperative with defense counsel. Additionally, there were numerous discrepancies between her trial testimony and her previous testimony at the preliminary hearing. (Tr. 436-455). However, the discrepancies had to do with things like the time, the details of the barbeque, and whether she and appellant argued that night. And Davis detailed an event where she left appellant in Cleveland and took a bus home at 2:30 a.m. because she did not want to get into a confrontation. (Tr. 412-417).

{¶53} Michele George was the emergency department nurse who treated

Davis on the night in question. George testified that Davis's chief complaint was that she was assaulted by her boyfriend and had pain in her neck, head, face, and right thumb. (Tr. 634). George stated that a CAT scan of Davis's head and face was ordered because of trauma as was an x-ray of her thumb. (Tr. 634). George noted that Davis had blood around her nostrils. (Tr. 636). George stated that she provided Davis discharge instructions after she was diagnosed with contusions to the face, head, and thumb and a nasal fracture. (Tr. 636). On cross examination, George acknowledged that a radiology report indicated that Davis's nose was not fractured. (Tr. 641).

{¶54} Youngstown Police Officer Robert DiMaiolo responded to the 911 call at Big A's. When he arrived, Officer DiMaiolo found a car with two females in the front seat and Davis, naked, in the back seat. (Tr. 652). He stated that Davis was crying and hysterical and had a bloody face and nose. (Tr. 652). Davis told Officer DiMaiolo that she was beat up by her boyfriend and shot at. (Tr. 653). She also told him where the assault took place. (Tr. 653). Officer DiMaiolo stated that Davis was taken away by ambulance. (Tr. 653). Officer DiMaiolo, along with other officers, next responded to the Glenwood Avenue home. (Tr. 653).

{¶55} Youngstown Police Officer Jerry Fulmer also responded to Big A's. Davis indicated to Officer Fulmer that she and appellant had been at a barbeque, they left together and went to 1823 Glenwood where appellant accused her of infidelity, hit her repeatedly, pulled a weapon on her, ordered her to strip, held her in the house for approximately three hours, and fired the weapon between her legs. (Tr. 667). Officer Fulmer stated that Davis described appellant's weapon and he recognized it to be either an Uzi or a MAC-11. (Tr. 669). He also observed a burn on the inside of Davis's thigh. (Tr. 669). Based on what Davis told him, Officer Fulmer believed appellant was still at the Glenwood Avenue house. (Tr. 671). Consequently, he contacted his sergeant and he, along with other officers set up a perimeter around the house. (Tr. 672-673).

{¶56} Youngstown Police Lieutenant Robin Lees was the Mahoning Valley

Task Force Commander. He stated that he was contacted regarding 1823 Glenwood where the Youngstown police believed appellant was barricaded in the house. (Tr. 687-688). Lt. Lees stated that when there was no response from the house, his team shot tear gas into the house. (Tr. 688-689). However, they found that the house was empty. (Tr. 689). When Lt. Lees entered the house, he observed a MAC-11 on the floor near the front window. (Tr. 690).

{¶57} Debbie Garner is the owner of 1823 Glenwood Avenue. Garner does not live in the house, however. Garner testified that she was acquainted with appellant and hired him to do maintenance work at the Glenwood house to get it ready to rent. (Tr. 699). She provided appellant with keys to the house. (Tr. 699-700). Garner stated that appellant did not live there. (Tr. 700). And she was unsure whether he stayed there occasionally. (Tr. 700).

{¶58} Youngstown Police Officer Phillip Chance also responded to Big A's. He stated that Davis was naked and that she reported that the man she had been dating "spazzed out" and started beating her up. (Tr. 709). Davis also told Officer Chance that appellant fired a weapon between her legs and touched her with the hot barrel of the gun. (Tr. 709). He observed a burn mark on her inner thigh. (Tr. 709-710). Officer Chance also spoke with the two girls in the car. They relayed to him that Davis got into their backseat while they were at a stop sign and they called 911. (Tr. 711). He determined that they had no involvement other than allowing Davis to sit in their car. (Tr. 711).

{¶59} After Davis was taken away by ambulance, Officer Chance went to the Glenwood Avenue home and helped to set up a perimeter around the house. (Tr. 711-712). He stated that after the SWAT team cleared the residence and determined that no one was inside, he entered the house and saw a MAC-11 weapon. (Tr. 713). Officer Chance stated that he picked up the gun and ran out of the house. (Tr. 713). He tagged and identified the weapon. (Tr. 714). He stated that he took it to the Youngstown Police Department and logged it in. (Tr. 722).

{¶60} At the close of Officer Chance's testimony, the state and defense

counsel stipulated to the chain of custody and the operability of the gun. (Tr. 729).

**{¶61}** Lieutenant John Kelty initially responded to the Glenwood Avenue house as part of the SWAT team. He testified that no people were found in the home but that an assault weapon was found. (Tr. 734). Lt. Kelty stated that police took the weapon from the house because the house was unsecured and they could not simply leave it there. (Tr. 734-735). Lt. Kelty also executed a search warrant at the house after speaking with Davis. (Tr. 737). In executing the warrant, police seized a machete, a bullet-proof vest, and a pair of lime-green pants with blood on them. (Tr. 737-738). He also observed blood on the kitchen floor. (Tr. 737).

**{¶62}** On cross examination, Lt. Kelty stated that he did not find any shell casings or wood chips from the floor. (Tr. 772). He further testified that he did not know who removed the gun from the house. (Tr. 778). But he stated that an officer would not simply pick it up and exit the house without photographing it. (Tr. 778). State's Exhibits 13, 14, and 15 and Defendant's Exhibit 3 were photographs of the weapon. Lt. Kelty did not observe what happened to the gun in this case. (Tr. 785).

**{¶63}** Finally, the defense called Nora Crystal, Davis's boss. Crystal testified that Davis did not work July 7 or 8. (Tr. 855). This directly contradicted Davis's testimony that she worked the day of the incident.

**{¶64}** Appellant first takes issue with Davis's credibility. He contends that Davis's testimony was not credible because she has a history of questionable actions in which she fled from a situation in dramatic fashion, her testimony was inconsistent, and she refused to give truthful answers to defense counsel's questions.

**{¶65}** But whether to believe Davis was a matter within the jury's province. Davis was uncooperative at times with defense counsel and her testimony regarding some details was contradicted by her preliminary hearing testimony. But overall Davis's testimony was consistent and was corroborated by other facts. Davis testified that appellant punched her in the face, head, and neck and broke her nose causing blood to gush out. And the nurse who treated Davis testified that Davis was diagnosed with contusions to the face, head, and thumb and a nasal fracture.

Additionally, Davis testified that appellant fired the gun and then dropped the hot gun into her lap. And Officers Fulmer and Chance testified that they observed a burn on Davis's inner thigh. Davis further testified that appellant ordered her to take off her clothes and use them to clean up the blood from the floor. And officers found Davis's blood-stained pants at the house. Furthermore, Davis was naked when she jumped into the car on Glenwood and police came to her aid. Finally, Davis described a gun and a machete to police that she stated appellant used to threaten her. And police located these items in the house.

**{¶66}** While an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give great deference to the fact finder's determination of witnesses' credibility. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶11. The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.*

**{¶67}** The jury must have found Davis's testimony to be at least somewhat credible because they concluded that appellant assaulted and kidnapped her. This was the jury's determination to make and we will not second-guess it.

**{¶68}** Second, appellant alleges that police tampered with the gun that was the subject of the gun specification and, therefore, the chain of custody was broken.

**{¶69}** But defense counsel stipulated to the gun's chain of custody. (Tr. 729). Thus, the jury would not have considered that the chain of custody was an issue.

**{¶70}** Finally, appellant points out that while Davis testified that appellant fired the gun, the police did not locate any bullet shells or bullet holes, and had no evidence that the gun was fired the evening of the incident.

**{¶71}** Whether or not appellant fired the gun, while going to Davis's credibility, did not otherwise affect whether the state proved all of the elements of kidnapping, assault, or the firearm specification. There is no requirement in either the assault or

kidnapping statutes under which appellant was convicted that the offender even possess, let alone fire, a weapon. Moreover, even the firearm specification does not require the offender to fire the gun. It is enough under the statute that the offender "displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A). Consequently, the fact that police did not locate any bullet holes or shells or find any evidence that the gun was fired does not undermine the jury's verdict.

{¶72} For all of the above reasons, we cannot conclude that the jury's verdict was against the manifest weight of the evidence.

{¶73} Accordingly, appellant's second assignment of error is without merit.

{¶74} Appellant's third assignment of error states:

THE TRIAL COURT ERRED IN PERMITTING PLAIN ERRORS THAT AFFECTED DEFENDANT'S SUBSTANTIAL RIGHTS.

{¶75} In this assignment of error, appellant raises five alleged plain errors.

{¶76} First, appellant asserts that the trial court erred in failing to suppress evidence and testimony in light of various *Brady* violations and the police department's intentional failure to preserve material evidence. Appellant argues once again that Officers Dimiaolo, Fulmer, and Chance should have taken the names, addresses, phone numbers, and statements of the two women whose car Davis jumped into. And he again contends that while interviewing Davis, the police should have recorded the names of the people Davis stated were at the barbeque and then gone back to the house to speak with any witnesses. Appellant also contends again that police should have conducted a gunshot residue test on Davis and should have looked for fingerprint evidence on the gun found at the scene.

{¶77} These arguments mirror those raised by appellant in his first assignment of error. As we have already determined these arguments are meritless, we need not review them again here.

{¶78} Second, appellant contends that it was error for the court to allow

testimony regarding the gun found at the scene because the state failed to prove its chain of custody.  He contends that the police removed the gun from the scene around 4:00 a.m., brought it to the police station, and then, somehow returned it to the scene around 2:00 p.m. to photograph it.

**{¶79}** As the state notes, appellant stipulated to the gun's chain of custody. (Tr. 729).  Moreover, breaks in the chain of custody go to the weight of the evidence, not its admissibility.  *State v. Blevins*, 36 Ohio App.3d 147, 150, 521 N.E.2d 147 (1987).  Thus, even if counsel had not stipulated to the gun's chain of custody, it would not have been error for the court to allow testimony about it since any breaks in the chain of custody would go to the weight of the evidence regarding the gun.  It would not render the evidence inadmissible.

**{¶80}** Third, appellant contends that the trial court erred in permitting the prosecutor to play a video of appellant's statement to police because appellant had asked for an attorney, yet police continued to question him.  He refers to Lt. Kelty's testimony for support.

**{¶81}** During Lt. Kelty's testimony, the state played a video of the Lieutenant's interview of appellant.  (Tr. 755).  At the beginning of the interview, prior to asking appellant any questions, Lt. Kelty informed appellant that he would read appellant his Miranda rights.  Lt. Kelty then began to read appellant his rights.  Part way through, appellant interrupted and asked, "Can I get a lawyer" and "you said I could get a lawyer."  Lt. Kelty told appellant to let him finish reading the Miranda rights.  Lt. Kelty then finished reading.  Next, appellant asked to read the Miranda rights himself.  Lt. Kelty gave appellant a copy to read and then appellant signed an acknowledgment that he was given his rights. Appellant did not request counsel again.  Instead, he answered the lieutenant's questions.

**{¶82}** Even if Lt. Kelty should not have questioned appellant, appellant cannot demonstrate prejudice.  Appellant did not say anything incriminating.  He simply denied being at 1823 Glenwood and argued with Lt. Kelty.  This interview was not a confession. Appellant cannot demonstrate that if the court had not allowed the

interview to be played for the jury, the result of the trial would have been different.

**{¶83}** Fourth, appellant argues that the court should not have permitted evidence and testimony regarding items found in the house during a warrantless search. He asserts that the police were not authorized to execute a warrantless entry into the house because by the time police arrived, Davis was out of harm's way and no exigent circumstances existed.

**{¶84}** The Fourth Amendment protects citizens from unreasonable searches and seizures. *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093 (1990). Warrantless searches are per se unreasonable unless they fall within an exception to a search warrant. *Katz v. U.S.*, 389 U.S. 347, 357, 88 S.Ct. 507 (1967).

**{¶85}** To raise a Fourth Amendment challenge to the seizure of evidence, the defendant must be able to demonstrate that his legitimate expectation of privacy was violated in relation to the place searched or the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421 (1978). In other words, the defendant must have standing to challenge the search. In determining whether a defendant has standing to challenge the search of a residence, we should consider: "the legitimate presence in the area searched; possession or ownership of the area searched or the property seized; prior use of the area searched or the property seized; ability to control other's use of the property and a subjective expectation of privacy." *State v. Thompson*, 7th Dist. No. 91-C-17, 1992 WL 356184, *7 (Nov. 25, 1992).

**{¶86}** In this case Garner, the home owner, testified that she hired appellant to do some work at the house. (Tr. 699). She gave him a set of keys. (Tr. 699). She testified that appellant did not live at the house while working on it. (Tr. 700). Garner was unsure whether appellant may have stayed at the house occasionally. (Tr. 700). She stated that to her knowledge, appellant never stayed overnight at the house. (Tr. 702-703). Instead, she stated that every morning she called and spoke to him at his mother's house. (Tr. 702).

**{¶87}** Considering the standing factors in light of the homeowner's testimony, appellant did not have a legitimate expectation of privacy at the Glenwood Avenue

house. Appellant was legitimately present at the house while he was working at it. But the homeowner did not grant him permission to stay at the house. Appellant did not own, rent, or lease the house. And while he did have possession of a set of keys to the house, this was for the purpose of doing work there, not residing there. Additionally, appellant was not to control others' use of the house; Garner was.

{¶88} Thus, appellant does not have standing to raise a challenge to the legality of the search. Therefore, there was no reason for the court to suppress evidence found in the house.

{¶89} Fifth, appellant asserts that the trial court erred when it failed to dismiss the indictment based on cumulative misconduct by the prosecution and the police. He argues that based on the cumulative errors set out in this assignment of error, the trial court should have dismissed the case against him.

{¶90} An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶91} Appellant has not demonstrated multiple errors that deprived him of a fair trial. As discussed above, his alleged errors lack merit.

{¶92} Accordingly, appellant's third assignment of error is without merit.

{¶93} Appellant's fourth assignment of error states:

DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶94} Here appellant claims that his trial counsel was ineffective in six different ways.

{¶95} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v.*

*Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

{¶96} Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

{¶97} First, appellant asserts that his counsel failed to file a discovery request or request for a bill of particulars.

{¶98} While there is no discovery request in the trial docket, counsel must have made one because the trial court acknowledged that the prosecutor provided information to appellant's counsel in his discovery packet. (Tr. 554-559). Defense counsel never stated that he did not receive the discovery packet, only that the prosecutor failed to provide him with a summary of Garner's testimony. Thus, we can presume that defense counsel received a discovery packet whether or not he filed a formal request for one. Furthermore, appellant has not asserted how he was prejudiced by his counsel's failure to request a bill of particulars.

{¶99} Second, appellant asserts his counsel failed to retain an expert to examine the gun and the machete for fingerprint or DNA evidence.

{¶100} Appellant, however, has failed to assert how the lack of an expert prejudiced him. The absence of his fingerprints would not have meant much considering Lt. Kelty's testimony that fingerprints could rarely be lifted from a firearm. Additionally, the presence of Davis's fingerprints would only indicate that she too touched the gun, which she stated appellant dropped in her lap. And as to the machete, Davis only testified that appellant threatened her with it. There was no testimony that appellant or Davis ever touched it.

{¶101} Third, appellant asserts his counsel failed to file a motion to suppress the evidence found in the house based on a warrantless search and seizure and a

broken chain of custody.

{¶102} As discussed above, appellant did not have standing to challenge the initial search of the house and seizure of the gun. And also as discussed above, chain of custody goes to the weight of the evidence, not the admissibility of the evidence.

{¶103} Fourth, appellant asserts his counsel failed to file a motion to suppress or object to his video statement even though his statement violated Miranda.

{¶104} Appellant's counsel did object to the playing of the video statement, albeit on different grounds. (Tr. 759-760). Moreover, appellant has failed to show how the DVD prejudiced his trial, especially since he did not confess to crimes during the interview.

{¶105} Fifth, appellant asserts his counsel failed to subpoena the 911 records to find the cell phone number that was used to report the crime in order to interview one of the women in the car that Davis jumped into.

{¶106} As stated above, Officer Chance testified that he spoke to the women from the car at the scene and determined that they had no involvement other than Davis jumped into their car. Appellant has failed to assert how he was prejudiced by counsel's failure to locate these women.

{¶107} Finally, appellant asserts his counsel failed to request a lesser-included-offense charge on the kidnapping count.

{¶108} Appellant does not assert which lesser-included offense instruction his counsel should have requested. Abduction can be a lesser-included offense of kidnapping as can unlawful restraint. Thus, his argument here is not specific.

{¶109} A lesser-included offense instruction is warranted where the evidence would reasonably support an acquittal on the crime charged and a conviction on the lesser-included offense. *State v. Carter*, 89 Ohio St.3d 593, 600, 734 N.E.2d 345 (2000). As discussed above, the evidence at trial clearly supported appellant's kidnapping conviction. It demonstrated that appellant, by force and threat, restrained

Davis in order to terrorize her and inflict serious physical harm. Because the evidence did not reasonably support an acquittal on the crime charged, a lesser-included offense instruction was not required.

**{¶110}** Based on the above, we cannot find that appellant's trial court was ineffective in any of the alleged ways. Accordingly, appellant's fourth assignment of error is without merit.

**{¶111}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Vukovich, J., concurs.

DeGenaro, J., concurs.